## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY GATTINERI, and<br>BOSTON CLEAR WATER COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TOWN OF LYNNFIELD, MASSACHUSETTS,<br>PHILIP B. CRAWFORD, CHAIRMAN, LYNNFIELD<br>BOARD OF SELECTMEN; JAMES M. BOUDREAU<br>AND ROBERT J. DOLAN, LYNNFIELD TOWN<br>ADMINISTRATORS; ROBERT CURTIN, ASSISTANT<br>TOWN ADMINISTRATOR; DAVID J. BREEN, CHIEF,<br>LYNNFIELD POLICE DEPARTMENT; PAUL<br>MARTINDALE, CHAIRMAN, LYNNFIELD<br>CONSERVATION COMMISSION; ELIZABETH<br>ADELSON AND EMELIE CADEMARTORI,<br>DIRECTORS OF PLANNING & CONSERVATION<br>FOR THE TOWN OF LYNNFIELD; KRISTIN<br>MCRAE, ADMINISTRATOR, LYNNFIELD<br>BOARD OF HEALTH; JOSEPH O'CALLAGHAN,<br>BUILDING INSPECTOR, TOWN OF LYNNFIELD;<br>WINNIE BARRASSO, ADMINISTRATIVE<br>ASSISTANT, LYNNFIELD  BUILDING<br>DEPARTMENT; PATRICK McDONALD,<br>INSPECTOR FOR THE TOWN OF LYNNFIELD;<br>JENNIFER WELTER, ASSISTANT TO THE<br>LYNNFIELD DIRECTOR OF PLANNING AND<br>CONSERVATION<br><br>Defendants. | **Civil No.:**<br><br>**Jury Trial Demanded** |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Plaintiffs Anthony Gattineri ("Gattineri") and Boston Clear Water Company, LLC

("BCW") (collectively "Plaintiffs"), through their attorneys Hinckley, Allen & Snyder, LLP and

Julie Connolly Law, PLLC, by way of complaint against Defendants, state as follows:

## INTRODUCTION

1.      This is an action for conspiracy to deprive Plaintiffs of their civil rights, in violation of 42 U.S.C. §§ 1983 and 1985(3).  Plaintiffs seek to enforce their rights to equal protection, due process, freedom of assembly and freedom of religion, guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Plaintiffs also seek to enforce rights arising under state law.  Plaintiffs seek both legal and equitable relief to redress the injuries they have sustained.

2.      This action arises out of the ongoing, concerted effort by Defendants to interfere with Plaintiffs' rights to freely use, enjoy and benefit from their property, located at 165 Lowell Street, Lynnfield, Massachusetts, better known as the Pocahontas Spring (the "Property").  Since BCW purchased the Property in June 2014, Plaintiffs have invested hundreds of thousands of hours and dollars in an effort to continue the spring mineral water business that has operated on the Property for over a century.  Gattineri also has sought to enjoy the spiritual atmosphere of the Pocahontas Spring and freely exercise his religion, by creating space for private prayer and contemplation on the Property.  Plaintiffs have been denied their liberty and property interests to freely use and enjoy the benefits of the Property, as a result of Defendants' scheme to literally and figuratively drive Plaintiffs out of town.

3.      Defendants have conspired to discriminate against Plaintiffs, based upon Gattineri's ethnicity and religion, at great personal and financial cost to Plaintiffs.  The Town of Lynnfield, through the combined efforts of municipal departments and agencies and individuals working therein, has implemented a policy of intimidation, harassment and discrimination towards Plaintiffs, causing Plaintiffs to suffer tremendous damage to their reputation and

enormous monetary losses.  As a direct and proximate result of Defendants' actions, Plaintiffs

have been denied rights protected by the United States Constitution, federal and state law.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of law of their rights as secured by the United States Constitution.  The Court has

federal question subject matter jurisdiction over this action, pursuant to 28 U.S.C. §§ 1331 and

1343.  The Court has subject matter jurisdiction over Plaintiffs' pendent state law claims

pursuant to 28 U.S.C. § 1367.

5.      The District Court has personal jurisdiction over Defendants, because the

individual defendants are domiciled in the District of Massachusetts and the Town of Lynnfield

is incorporated in the Commonwealth of Massachusetts.

6.      Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391,

because the Defendants all reside there, the events, omissions and conduct giving rise to the

claims asserted herein occurred there, and BCW's principal place of business is located there.

## PARTIES

7.      Boston Clear Water Company, LLC ("BCW") is a Massachusetts limited liability

company, with a principal place of business at 165 Lowell Street, Lynnfield, Massachusetts,

01940.  BCW is the owner and operator of a commercial spring mineral water business that has

operated at 165 Lowell Street as the Pocahontas Spring Water Company since at least 1901.

BCW currently does business under the trade name Pocahontas Mineral Spring.

8.      Plaintiff Anthony Gattineri ("Gattineri") is the manager of BCW, through his

ownership and management of Snakebite Realty, LLC.  He is an individual domiciled at 360

Westwind Court, Vero Beach, FL 32968.  Gattineri also resides in Winchester, Massachusetts.

9.      Defendant Town of Lynnfield, Massachusetts (alternately "Town" or "Lynnfield") is a municipality incorporated under the laws of the Commonwealth of Massachusetts.  The Town of Lynnfield, through its agents and employees, caused tortious injury in the Commonwealth of Massachusetts by acts and omissions committed in the Commonwealth of Massachusetts.

10.     Defendant Philip B. Crawford ("Crawford") is the Chairperson of the Lynnfield Board of Selectmen.  At all relevant times, Crawford was acting under color of state law and, in the course and scope of his employment with the Town, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts.  Crawford is sued in his individual capacity and official capacity.

11.     Defendant Robert J. Dolan ("Dolan") is the Town Administrator for Lynnfield. At all relevant times, Dolan was acting under color of state law and, in the course and scope of his employment with the Town, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts.  Dolan is sued in his individual capacity and official capacity.

12.     Defendant James Boudreau ("Boudreau") was the Town Administrator for Lynnfield, until he resigned in December 2017.  At all relevant times, Boudreau was acting under color of state law and, in the course and scope of his employment with the Town, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts. Boudreau is sued in his individual capacity and official capacity.

13.     Defendant Robert Curtin ("Curtin") is the Assistant Town Administrator for Lynnfield.  At all relevant times, Curtin was acting under color of state law and, in the course and scope of his employment with Lynnfield, caused tortious injury by his acts and omissions

committed in the Commonwealth of Massachusetts.  Curtin is sued in his individual capacity and official capacity.

14.     Defendant David J. Breen ("Breen") is the Chief of the Lynnfield Police Department.  At all relevant times, Breen was acting under color of state law and, in the course and scope of his employment with Lynnfield, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts.  Breen is sued in his individual capacity and official capacity.

15.     Defendant Paul Martindale ("Martindale") is the Chairman of the Lynnfield Conservation Commission.  At all relevant times, Martindale was acting under color of state law and, in the course of his work for the Lynnfield Conservation Commission, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts.  Martindale is sued in his individual capacity and official capacity.

16.     Defendant Elizabeth Adelson ("Adelson") was the former Director of Planning & Conservation for the Town of Lynnfield until her retirement in 2019.  At all relevant times, Adelson was acting under color of state law and, in the course of her employment with the Town, caused tortious injury by her acts and omissions committed in the Commonwealth of Massachusetts.  Adelson is sued in her individual capacity and official capacity.

17.     Defendant Emilie Cademartori ("Cademartori") is the current Director of Planning & Conservation for the Town of Lynnfield.  At all relevant times, Cademartori was acting under color of state law and, in the course of her employment with the Town, caused tortious injury by her acts and omissions committed in the Commonwealth of Massachusetts.  Cademartori is sued in her individual capacity and official capacity.

18.     Defendant Kristin Esposito McRae ("McRae") is the Health Director for the Lynnfield Board of Health.  At all relevant times, McRae was acting under color of state law and, in the course of her employment with the Town, caused tortious injury by her acts and omissions committed in the Commonwealth of Massachusetts.  McRae is sued in her individual capacity and official capacity.

19.     Defendant Joseph O'Callaghan ("O'Callaghan") is the Building Inspector for the Town of Lynnfield.   At all relevant times, O'Callaghan was acting under color of state law and, in the course of his employment with the Town, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts.  O'Callaghan is sued in his individual capacity and official capacity.

20.     Defendant Winnie Barrasso ("Barrasso") is the Administrative Assistant to the Lynnfield Building Inspector and Board of Appeals.  At all relevant times, Barrasso was acting under color of state law and, in the course of her employment with the Town, caused tortious injury by her acts and omissions committed in the Commonwealth of Massachusetts.  Barrasso is sued in her individual capacity and official capacity.

21.     Defendant Patrick McDonald ("McDonald") is an employee for the Town of Lynnfield, who works as the Geographic Information System ("GIS") Coordinator and Field Inspector for the Lynnfield Conservation Commission and the Lynnfield Department of Public Works.  At all relevant times, McDonald was acting under color of state law and, in the course of his employment with the Town, caused tortious injury by his acts and omissions committed in the Commonwealth of Massachusetts.  McDonald is sued in his individual capacity and official capacity.

22.     Jennifer Welter ("Welter") is an assistant to the Lynnfield Director of Planning

and the Conservation Commission.  At all relevant times, Welter was acting under color of state

law and, in the course of her employment with the Town, caused tortious injury by her acts and

omissions committed in the Commonwealth of Massachusetts.  Welter is sued in her individual

capacity and official capacity.

## FACTUAL ALLEGATIONS

### A.     Background Facts

23.     The Pocahontas Spring has been the source of a natural spring mineral water

business on the Property since 1901, when Joseph Smith began selling water to residential and

commercial customers.  Throughout the twentieth century, the business thrived, operating as a

legal, non-conforming use of the Property given its location in a residential zone of the Town.

By June 2014 when BCW bought the Property, the business had deteriorated, and Gattineri, as

BCW's manager, immediately commenced work to clear out debris, restore the buildings, and

ensure the business was in compliance with oversight regulations.  Plaintiffs contacted various

state and local officials in order to reactivate the Pocahontas Spring as a public water supply,

which the Massachusetts Department of Environmental Protection ("MassDEP"), Drinking

Water Program had identified it as being in 2012.  Plaintiffs also invested thousands of dollars to

obtain licenses to continue operating the commercial spring mineral water business, to retain

suppliers for packaging equipment and water quality control testing, and to solicit new

customers.

24.     In the winter and spring of 2014 - 2015, but unbeknownst to Plaintiffs at that

time, McRae (the Health Director for Lynnfield) began receiving phone calls from Lynnfield

residents reporting alleged concerns about Gattineri's purported connections to organized crime,

claiming that BCW was a shell corporation, that construction was being done without permits, and that suspicious burying of bags had occurred on the Property.  None of these allegations had any merit whatsoever and were complete unsubstantiated, rank speculation, yet McRae relayed these false reports to the Lynnfield Board of Health ("LBOH"), Adelson at the Lynnfield Conservation Commission ("LCC"), and the MassDEP.

25.     Upon information and belief, based upon these malicious rumors, by 2015, and unbeknownst to Plaintiffs at the time, Defendants were maligning Gattineri's character and scheming about how to drive Plaintiffs out of town.  Under the leadership and direction of Crawford, Chairperson of the Lynnfield Board of Selectmen, at least as early as 2016, the Town of Lynnfield began implementing a policy of discrimination against Plaintiffs, because of Gattineri's Italian ethnicity, national origin and Catholic and Native American religious beliefs.

26.     Plaintiffs have also learned that Defendants agreed to work together and enlisted the help of or otherwise encouraged private citizens to harass Plaintiffs, in furtherance of Defendants' plan to deprive them of their civil liberties.  Defendants implemented this policy of discrimination by choosing to respond to citizen complaints against Plaintiffs while ignoring Plaintiffs' reports of violations against them, by delaying and/or denying approvals for permits and other authorizations for work on the Property, and by enforcing zoning and conservation regulations in an unfair and discriminatory fashion, all with the specific intent to prevent Plaintiffs from operating the spring mineral water business and from exercising their religious freedom.

**B.      Discovery of the Agreement to Discriminate Against Plaintiffs**

27.     Plaintiffs were unaware of Defendants' coordinated plan to deprive them of their civil rights until several years after BCW purchased the Property.  Upon information and belief,

Defendants actively sought to cover up the Town's involvement by creating the impression that the enforcement actions taken against Plaintiffs were solely the result of private petitioning activity.

28.      In furtherance of this scheme, in August and September 2016, Defendants withheld documents Plaintiffs had requested from the LCC.  At that time, the LCC was prosecuting an enforcement order against BCW for work it had done in the wetlands.  During LCC hearings regarding the enforcement order, several community members voiced opposition to BCW and mocked representatives of BCW, in particular Native Americans who had come to address the Property's value to them.  During one meeting, the LCC stopped the Native Americans from voicing their support of Plaintiffs, but allowed a neighbor to falsely accuse Gattineri of having stalked her, something that was impossible as Gattineri was in California visiting his daughters at the time.  Upon his return to Lynnfield, Gattineri asked Adelson for all documents in the LCC's possession concerning the Pocahontas Spring, BCW or himself, including recordings of the LCC meetings.  Adelson advised Gattineri that she had no such documents and claimed that the Town's new tape recorder had malfunctioned, so there were no recordings of the meetings either.

29.      In September 2016, Plaintiffs, through counsel, submitted a request for public records to the LCC and the LBOH.  On October 21, 2016, the LCC requested payment, which Plaintiffs sent, but no documents were produced.  In fact, the LBOH never even responded to the public records request.  Only after Plaintiffs appealed to the Secretary of the Commonwealth were the documents produced:  in December 2016 by the LCC and in January 2017 by the LBOH.  The documents that were produced included some email correspondence from neighbors to Adelson, complaining about Plaintiffs' activities at the spring, in particular Gattineri's display

9

of Native American objects and his Native American guests.  Crawford and McRae were copied on a few emails that the complaining neighbors sent.

30.     Three years later, on November 25, 2019, as part of a settlement agreement BCW reached with a neighbor (the "Sievers Settlement"), Plaintiffs received emails that revealed the Town's decision to prevent Plaintiffs from discovering that Town officials were working with neighbors of BCW to obstruct Plaintiffs' efforts to operate the spring mineral water business and interfere with Gattineri's religious and associational freedoms.  Among the emails was one dated October 7, 2016 — after Plaintiffs had requested documents but before any response had been produced — when neighbors emailed Adelson and Crawford to complain about trucks on BCW's property and discuss enforcement action against BCW.  A neighbor concluded that email chain:

> Hello to all;
>
> Please do not send any emails to Conservation Commission persons. I have become aware of a "Request for all public documents" made to Con Comm office by Boston Clear Water Co attorney.  This is also retroactive.  I'm assuming any & all email sent to Con Comm employees during the past 2 years will have to be made available to the BCW attorney. So please no more attached pictures or notes to Con Comm office via their email addresses.  A better alternative for communication is to call the Con Comm office & request a call back w/o mentioning subject matter.
>
> I am not sure of any similar implication for Selectman's Office so I have removed Phil [Crawford] from email chain (and Betty Adelson, Con Com Administrator).

31.     This October 7, 2016 email chain, which included Adelson and Crawford, was not produced by the LCC, but, rather, appears to have been held back by the LCC, in response to BCW's September 2016 request.  Indeed, Plaintiffs did not see this email until more than three years later, when it was produced on November 25, 2019, not by the LCC but, rather, as part of a the Sievers' Settlement.

32.     Plaintiffs first began to discover the Town's policy to discriminate against them

when they began receiving responses to a July 14, 2017 public records request that they made to

several Town departments, boards and commissions.  Although some response were timely

produced in early August 2017, other departments dragged their feet, forcing Plaintiffs to follow

up with several requests before documents were produced, including follow up requests made to

the Lynnfield Board of Selectmen, the Lynnfield Planning Board, the LBOH and the Lynnfield

Center Water District, between late September and December 2017.

33.     Curtin (Assistant Town Administrator) produced documents in early October

2017 responding to requests to the Board of Selectmen and the Town Administrator, which

included documents from Crawford (Chairperson of the Board of Selectmen) and Boudreau (then

Town Administrator).  Among the documents produced were emails between Boudreau,

Crawford, Breen (Chief of Police), and a neighbor, Bill O'Brien ("O'Brien").  These e-mails

revealed the agreement between Town officials, employees and agents, to work together and to

enlist the assistance of private citizens in order to interfere with Plaintiffs' rights to use and enjoy

the Property.  For example:

> - August 19, 2016 email from Crawford to Boudreau and Breen saying
> to look into the activities at BCW, with Boudreau explaining it was
> "[s]omething to do with the water company on Lowell st saying that
> it is an Indian sacred site for rituals."
>
> - June 6, 2017 emails from Boudreau telling O'Brien how to file a
> complaint to the ZBA, directing O'Brien to get it done as soon as
> possible, and assuring O'Brien that Boudreau will "get [the Building
> Inspector] right on it," that "we will move it as fast was we can" and
> that he "will do his best for July 11 [ZBA meeting] but cannot promise";
>
> - June 9, 2017 email from Boudreau to O'Brien and Crawford about
> Town Counsel's meeting with BCW representatives and assuring
> O'Brien that he "[w]ill let you know what is going on";

11

- June 14, 2017 email from O'Brien to Boudreau recommending that the Town's departments discuss the "multi page list of complaints" against BCW that he left with Curtin and advising Boudreau that he and several residents had met with Breen the previous day to "bring him up to date on issues"; and

- June 20, 2017 email from Boudreau to O'Brien disclosing what was discussed at the meeting between the Town and BCW.

34.    Also discovered in the documents Curtin produced in early October 2017 was a June 20, 2017 email from him to Boudreau, Crawford and the other members of the Board of Selectmen to report that while the Building Inspector would not be taking enforcement action against BCW at that time, a plan for next steps was being put in place:

> Bill O'Brien from the Lowell St./Pocahontas neighborhood was by today about the building inspector's decision re:  Boston Clear Water. … He asked that I pass this decision on to you so you are aware.  … I spoke with Mr. O'Brien for some time this afternoon. **His neighbors seem to think this is a matter of applying some political pressure at Town Hall**, but Mr. O'Brien understands that there is a process and that appealing the decision at the ZBA is the next step.  **He was grateful for the effort the Town is making**. (emphasis added)

35.    Upon information and belief, Crawford deployed his political power to convince Defendants to use the authority of their positions to facilitate, legitimize and enforce complaints from O'Brien and other Lynnfield residents (collectively "the Neighbors") as a front for the Town's policy to harass Plaintiffs and deny them of their rights to use and enjoy the Property.

36.    Upon information and belief, the Town unequally deployed its resources to protect and advance the interests of the Neighbors and deprive Plaintiffs of their constitutional rights.  The Town adopted this policy of unequally protecting the Neighbors' interests, to cover up both its plan to obstruct Plaintiffs' right to operate a commercial spring mineral water business on the Property and its animus against Gattineri's Italian ethnicity and Catholic and

Native American religious beliefs.  Defendants agreed to implement this policy of discrimination in furtherance of the goal of driving Plaintiffs out of Town.

37.     Upon information and belief, the agreement amongst Defendants began as early as the fall of 2014 and continues to this day.  Defendants' concerted efforts to conceal the Town's involvement prevented Plaintiffs from discovering the scheme for several years — not until the fall of 2017 initially and not clearly until after the Sievers' Settlement in December 2019 — while untold damage was being done to Plaintiffs' business and reputation.  Pursuant to the agreement amongst Defendants to effectuate a policy of discrimination based upon Gattineri's ethnicity, national origin and religious beliefs, all Defendants have used their positions and power to prevent Plaintiffs from operating the spring mineral water business, in violation of Plaintiffs' fundamental liberty interests in engaging in lawful, industrial pursuits to earn a living, and to prevent Gattineri from exercising his religious freedom.

### C.     The Campaign of Harassment and Discrimination

38.     Defendants have used the enforcement authority of the Conservation Commission, the Building Department and the Police Department to conceal the Town's policy of discriminating against Plaintiffs.  By investigating alleged violations and seeking to enforce regulations against Plaintiffs, for activities that either never occurred or that other Lynnfield residents do with impunity, Defendants have denied Plaintiffs equal protection of the law and deprived them of their right to freely use, enjoy and benefit from the Property.  Defendants have arbitrarily denied or delayed permits for work on the Property, causing Plaintiffs to expend enormous resources pursuing protection of their fundamental rights, in multiple forums over many years.  Defendants have abused their positions, knowing their acts were coordinated with the others, to achieve their common goal of preventing Plaintiffs from operating a commercial

13

spring mineral water business and driving Plaintiffs out of Town, because of their animus

towards Gattineri's Italian heritage, ethnicity and religious beliefs.

### 1.  LCC Enforcement

#### a.  The July 2016 Enforcement Order

39.     On July 27, 2016, the LCC issued an enforcement order against BCW for

unauthorized work that had been done in the wetlands on the Property (the "July 2016

Enforcement Order").  At a hearing about the July 2016 Enforcement Order, Native Americans

came to explain the Property's spiritual value to them.  The LCC declined to hear the Native

Americans on the advice of Town counsel, who warned the LCC not to fall for "this spirituality

stuff."  When Gattineri asked Adelson (then Director of Planning and Conservation) for a tape of

the hearing and any other documents she had related to the Property, Adelson responded that she

had nothing.  Based upon records that were later produced to Plaintiffs, there were such

documents but Adelson withheld the same, presumably to avoid disclosure of the Town's

antipathy towards Gattineri and his association with Native Americans.

40.     Throughout August and September 2016, the Neighbors made multiple reports to

McRae, Adelson, Breen, Crawford and Boudreau about Native American customers at BCW and

Native American objects, such as a flag and a dream catcher, which Gattineri displayed on the

Property.  These reports were not germane to the LCC's enforcement activity, but instead were

directed at Gattineri's association with Native Americans.  McRae, Adelson, Breen, Crawford

and Boudreau speculated that the Native Americans were "imposters" and  that Gattineri's

association with them was feigned spirituality.  These Defendants coordinated their efforts to

disrupt Gattineri's activities on the Property, because they did not want Native Americans coming to Lynnfield and changing the character of the Town.

41.    Adelson and Martindale (member of the Conservation Commission at the time and now Chairman) violated Plaintiffs' rights by entering onto the Property, without providing them with the requisite notice, under the guise of legitimate enforcement activity, when the true purpose of their visits was to advance Defendants' scheme of interrupting Plaintiffs' business operations and denying Gattineri's religious and associational freedoms.  For example:

> - on August 31, 2016, Adelson came onto the Property when Gattineri and his Native American guests were preparing for a prayer service. She allegedly came to inspect the wetlands, although no remediation plan had been submitted or approved, thereby affording her no arguable basis at the time for inspecting the wetlands.  Adelson also photographed the Property despite signs prohibiting photographs for spiritual reasons;
>
> - on October 22, 2016, the LCC arrived with the LPD to stop allegedly unauthorized work on the Property that in fact was approved remediation work.  The show of force threatened and intimidated BCW's workers and interrupted its business, at significant cost to Plaintiffs;
>
> - on December 27, 2016, Martindale came to the Property, when no work was being done and no representative of Plaintiffs was on site, affording him no arguable basis for being there.  Despite signs clearly prohibiting photography, he took pictures and submitted a report to the LCC; and
>
> - on May 16, 2017, Adelson came to inspect the remediation work Plaintiffs had done.  Among the photos she took was a Native American prayer pole and a sign that stated:  "This is a  Sacred Healing Spring." The prayer pole and the sign were outside the LCC's jurisdictional authority and irrelevant to the remediation work Plaintiffs had done.

42.    These LCC visits were not done in good faith for any legitimate purpose related to conservation enforcement, but instead were done maliciously, to intimidate Gattineri, in furtherance of Defendants' plan to violate Gattineri's civil rights and prevent BCW from operating a commercial spring mineral water business.  Martindale and Adelson knew they were trespassing when they entered onto the Property without giving Plaintiffs notice of their visit,

and they both knew Gattineri's Native American guests and the Native American spiritual symbols and objects were unrelated to the LCC's enforcement work.  Martindale and Adelson abused their positions with the LCC to intimidate Gattineri and deprive him of his religious freedom.

### b.    The May 2017 NOI

43.    On May 30, 2017, BCW filed a Notice of Intent (the "NOI" or "May 2017 NOI") with the LCC for work that needed to be done on the Property.  The NOI provided detailed information about Plaintiffs' plan to improve the buildings and grounds to better facilitate the operation of the spring mineral water business that had existed on the Property since 1901.  Upon information and belief, Crawford, Boudreau, Curtin, Adelson, Martindale, McRae and Breen encouraged the Neighbors to solicit Lynnfield residents to voice opposition to the proposed work at the LCC hearings when BCW's NOI was reviewed.

44.    To stoke opposition, the Neighbors falsely told other Lynnfield residents that Plaintiffs intended to destroy the Pocahontas Spring and build a water bottling plant, operating 24/7, jeopardizing the wetlands and the Ipswich River basin and adversely impacting the entire community.  Defendants knew the Neighbors were spreading these rumors and encouraged this public opposition to the NOI, to cover up the Town's plan to drive Plaintiffs out of Lynnfield by denying them of their rights to freely use and benefit from their Property.

45.    During the six months that the LCC considered the NOI, Adelson and Martindale violated Plaintiffs' rights by making unannounced visits to the Property and interfering with Plaintiffs' use of the Property without any legitimate basis for doing so.  For example:

> - in June 2017, Adelson responded to a Neighbor's claim that BCW was unlawfully cutting trees and orally issued a cease & desist order. Adelson did not confer with Plaintiffs, confirm the boundary of the

16

buffer zone or otherwise verify the accuracy of the alleged illegal
cutting before taking official action in issuing the cease & desist order.
Plaintiffs were clearing trees that had grown into electrical power lines
outside of the 100 foot wetland buffer zone.  Adelson's order caused
Plaintiffs to incur substantial damages, from the tree-removal contract
and the lost electricity that interrupted BCW's business operations.

- in August 2017, Adelson, Martindale and another LCC commissioner
came to the Property to review BCW's NOI.  At the time, Gattineri had
Native American guests there, and Adelson and Martindale proceeded
to question them, including invasive questions about their heritage and
ethnicity.  There was no legitimate purpose for Adelson, Martindale
and/or the other LCC commissioner to have interrogated the Native
American guests about their heritage or ethnicity.  Indeed, speaking
to those guests (including inquiring about their heritage and ethnicity),
was completely irrelevant to and outside the jurisdiction of the LCC's
enforcement power.  Since that encounter, Gattineri's Native
American guests have been afraid to come back to the Property.

46.     Upon information and belief, Crawford and Boudreau, on behalf of the Town,

solicited the Lynnfield Center Water District ("LCWD") to review BCW's NOI, because the

Town wanted to divert Plaintiffs' water for its own purposes.  The LCWD presented a letter at

the September 2017 LCC hearing written by CDM Smith, an environmental consulting,

engineering and construction company, which concluded that the commercial spring water

business on the Property could adversely impact the Town's water supply.  Plaintiffs were not

contacted by the LCWD or CDM Smith when the research for the letter was being conducted, to

inquire about Plaintiffs' plans for the spring or to ask for access to the Property to learn anything

about BCW's processing facility or the spring's supply of water.

47.     CDM Smith's conclusions that Plaintiffs' planned use of the spring would

negatively impact the Town's water supply were made without even attempting to obtain any

information from Plaintiffs.  The LCC relied on the CDM Smith letter, in part, to deny approval

of several aspects of the May 2017 NOI.  Upon information and belief, Crawford, Boudreau,

Adelson, McRae and Martindale engaged CDM Smith for the purpose of obtaining that opinion,

17

to advance the goal of preventing Plaintiffs from doing work that was needed in order to operate

a commercial spring mineral water business on the Property, in violation of their Fourteenth

Amendment rights.

48.     The CDM Smith letter also specifically found that the Property was not on any

Native American land.  Upon information and belief, Boudreau and Crawford directed the

LCWD to require CDM Smith to include that statement – which was irrelevant to the water

supply analysis it was hired to perform – to undermine Plaintiffs' position that the Pocahontas

Spring is an ancient source of healing water, sacred to Native Americans, in order to prevent

Plaintiffs from trying to seek protection of the Property based upon Gattineri's First Amendment

rights to freedom of association and freedom of religion.  The Town's request for CDM Smith's

opinion about Native American rights to the Property was not keyed to any legitimate

governmental interest but, instead, was intended to intimidate Gattineri into renouncing his

devotion to the Native American influence on the Pocahontas Spring.

49.     BCW owns the land, but who the actual owner of the land is does not diminish the

spiritual value of the Pocahontas Spring to the Native Americans and to Gattineri.  For centuries,

the Native Americans have believed that the Pocahontas Spring water has healing powers and

that the Pocahontas Spring is a sacred spiritual place.  Gattineri agrees with the Native American

belief in the healing mineral water and sacred spirituality of the Pocahontas Spring.

50.     Upon information and belief, at the direction of Crawford and Boudreau,

Martindale and Adelson caused the LCC to rely on the CDM Smith letter, in bad faith, knowing

that it was being used to disguise their racial animus towards Gattineri and his association with

Native Americans.  Defendants also used the CDM Smith letter improperly, to legitimize the

Town's goal of preventing Plaintiffs from using the Property as a commercial spring water

business, which was the principal use of the Property Plaintiffs intended when BCW purchased it in June 2014.

51.     In December 2017, the LCC issued an Order of Conditions conditionally approving the May 2017 NOI (the "December 2017 OOC").  One of the conditions of approval restricted Plaintiffs from disturbing the hillside above the springhouse out to the 100-foot boundary of the wetland buffer zone.  This condition expanded the LCC's authority to prevent any work on the Property from 50 feet to 100 feet and required Plaintiffs to seek LCC approval before doing anything that would disturb the hillside above the springhouse within the 100-foot buffer zone.  Plaintiffs appealed the December 2017 OCC to both the MassDEP and the Superior Court.  While the December 2017 OOC was on appeal, the LCC and Plaintiffs negotiated a final order of conditions in April 2019 that resolved several disputed issues, including the 100-foot no disturb buffer zone on the hillside above the springhouse (the "April 2019 FOC").

52.     Despite this agreement, on the advice of Town Counsel, Cademartori (current Director of Planning and Conservation) and Martindale have refused to sign the April 2019 FOC. As a result, Cademartori and Martindale have directed the LCC not to give Plaintiffs permission to install a septic system, which was an item agreed upon by the Town as part of the April 2019 FOC.  By refusing to sign the April 2019 FOC, Cademartori and Martindale have intentionally further delayed the necessary work on the buildings and the grounds that Plaintiffs first requested permission to do in the May 2017 NOI.  This now more than three-year delay has caused Plaintiffs to suffer significant lost business opportunities.

53.     Also, despite the agreed-upon April 2019 FOC, the LCC has unlawfully expanded the 100-foot buffer zone, which was limited to the hillside above the springhouse, to incorporate the entire Property, without any legal authority to do so.  Cademartori and Martindale have

knowingly misused their positions to seek to enforce a 100-foot no disturb boundary throughout the Property, to deliberately interfere with Plaintiffs' landscaping work, in order to advance the Town's policy of preventing Plaintiffs from continuing the commercial spring water operations and protecting the public water supply that are located on the Property.

54.     Martindale and Cademartori have abused their positions with the LCC to cover up the Town's policy of discrimination against Plaintiffs with the cloak of legitimate enforcement authority.  Their refusing to sign the April 2019 FOC and denying permission for work that Plaintiffs requested in the May 2017 NOI has caused Plaintiffs to expend enormous personal and financial resources simply to protect their legal rights to freely use and enjoy the Property.

55.     Defendants all know that the protracted review and approval process that Plaintiffs have endured has prevented them from modernizing the Pocahontas Spring into a 21st century commercial spring mineral water business.  Defendants intend for their concerted efforts to cause this delay and to jeopardize the integrity of the public water supply, to further their agreement to implement the Town's policy of discrimination in order to drive Plaintiffs out of Town.  The resulting denial of Plaintiffs' liberty interests in earning a living and engaging in contracts has cost Plaintiffs hundreds of thousands of dollars in lost opportunities.

### c.  The June 2019 Enforcement Order

56.     On June 18, 2019, the LCC issued an enforcement order against BCW for alleged unauthorized work on the Property.  Martindale and McDonald (Lynnfield employee) went to the Property to inspect and photograph the alleged violations, again without providing the requisite notice to Plaintiffs.  The LCC cited BCW for "unpermitted tree removal, path construction and installation of granite benches," ordered BCW to immediately cease and desist, and threatened a $25,000 fine if BCW failed to comply.  Cademartori, as well as Martindale and other members

20

of the LCC, signed the enforcement order (the "June 2019 Enforcement Order"), which continues to this day.

57.     Plaintiffs had not done any work in violation of LCC regulations.  Indeed, Plaintiffs had not done any tree clearing or constructed any path within the100-foot no disturb zone.  Rather, Gattineri had a large wooden cross carried up the hill and placed in a hole already existing in the ground.

58.     Gattineri also had not disturbed the 25-foot buffer zone.  Gattineri replaced an old rusting bench with a granite bench and placed a second granite bench on old stone footings that remained in the ground.  The benches were installed manually.  Both benches have messages inscribed on them:  one has a spiritual passage and Native American symbols and the other has a quote from the former owner and Christian symbols.  When McDonald came to inspect that day, he specifically focused his camera on the messages inscribed on the benches.

59.      Nothing within the 25-foot buffer zone was disturbed, and nothing within the 100-foot buffer zone caused any alteration in connection with these activities.  The LCC issued the June 2019 Enforcement Order not because of any unlawful alteration of the resource area, but instead to coerce Gattineri into giving up his dedication to honoring the spiritual qualities of the Pocahontas Spring, which the cross and the benches symbolize.

60.     When Plaintiffs challenged the June 2019 Enforcement Order, Martindale retracted the cited violations related to the cross and the benches and claimed other activity was actually at issue.  Martindale manipulated the record to disguise the religious animus motivating the enforcement action.

61.     Despite the fact that Plaintiffs had done nothing to warrant the June 2019 Enforcement Order, the LCC has refused to sign the April 2019 FOC because Plaintiffs have not

21

paid the $25,000 fine.  The April 2019 FOC, however, is unrelated to the June 2019 Enforcement

Order.  Cademartori and Martindale's unlawful refusal to sign the April 2019 FOC – and

purporting to tether approval to payment of a bogus fine on an unrelated matter – have prevented

Plaintiffs from doing necessary work and thereby interfered with their right to operate a

commercial spring water business on the Property.  Martindale, Cademartori and McDonald have

pursued this LCC enforcement activity to advance Defendants' scheme to harass and

discriminate against Plaintiffs in violation of their civil rights.

62.     On July 12, 2019, Welter (Cademartori's assistant) went to the Property early one

morning when, upon information and belief, she thought no one was there, and took pictures of

the Property.  Gattineri, however, was at the Property and approached Welter to inquire about her

purpose for being there. Welter ran to her car and sped away, nearly hitting Gattineri as she

exited.  Given the timing of Welter's visit to the Property, the fact that no advance warning was

given, and her hasty departure upon seeing Gattineri, its appears that Welter's secret visit to the

Property was part of Defendants' overall agreement to use their positions within the Town to

pursue enforcement action to discriminate against Plaintiffs.

63.     On October 4, 2019, Martindale and McDonald returned to the Property to inspect

whether Plaintiffs had followed the June 2019 Enforcement Order.  Martindale and McDonald

documented their site visit with reports that misrepresented their observations and

communications with Plaintiffs, claiming that evidence of a path and other alteration of the

wooded hillside remained and that a BCW representative "fell into a trap" to concede that

erosion controls should have been put in place before the work was done.  Martindale and

McDonald submitted these misleading reports to cover up the fact that baseless enforcement

action had been taken and to disguise Defendants' prejudice against Gattineri – all in furtherance

of the Town's policy of harassment and discrimination against Plaintiffs to deprive them of the value of the Property.

64.     Upon information and belief, the LCC issued the June 2019 Enforcement Order, with its $25,000 fine, to intimidate Plaintiffs, as part of Defendants' agreement to further the Town's policy of discrimination against Plaintiffs, based upon the religious and ethnic animus towards Gattineri.  The June 2019 Enforcement Order was not issued in response to any legitimate concern about violations of conservation regulations, but was issued because of the religious symbolism that Gattineri displayed on the Property with the cross and the bench engravings.  Martindale, Cademartori, McDonald and Welter worked together to try to legitimize the June 2019 Enforcement Order, to further the conspiracy among Defendants to wear down Plaintiffs until they gave up the spring mineral water business that they purchased in 2014 and to drive them out of Town.

### d.  The August 30, 2019 NOI

65.     On August 30, 2019, Plaintiffs filed another Notice of Intent for work that needed to be done on the springhouse, to comply with MassDEP spring construction standards (the "August 2019 NOI").  The LCC was unable to hold a hearing on the NOI in the required time period due to lack of a quorum, and it failed to ask BCW for an extension of time to consider the NOI.  Plaintiffs appealed to MassDEP for a superseding order of conditions ("SOC") to do the work, which was granted.

66.     Despite Plaintiffs obtaining approval from the MassDEP to do this critical work to the springhouse foundation, Martindale and Cademartori declined to recognize the SOC. Throughout the fall of 2019, the LCC continued to schedule the August 2019 NOI on its meeting agendas, and it finally denied the request in February 2020 based upon BCW's failure to appear

to defend the NOI.  Again under the guise of legitimate enforcement authority, when Cademartori and Martindale knew the LCC had lost jurisdiction over the NOI and the MassDEP had issued an SOC, they issued a detailed order to try to justify the LCC's decision.

67.     Martindale and Cademartori, as the leaders of the LCC, have made decisions intended to impede Plaintiffs' ability to operate a spring mineral water business and to force Plaintiffs to waste more time and money on appeals to protect their rights to use and enjoy the Property.  Plaintiffs appealed to Superior Court to seek reversal of the LCC's decision; and the LCC requested an adjudicatory hearing to review the SOC, despite the fact that the approved springhouse repair work is required by state law and necessary to protect the public water supply. Martindale and Cademartori have engaged in this protracted review process as part of their coordinated efforts to advance the Town's policy of discriminating against Plaintiffs because of Gattineri's Italian heritage and presumptively nefarious and illicit activities, in order to deny them of their fundamental rights and drive them out of Town.

68.     Given all of the aforementioned conduct, and upon information and belief, Crawford, Boudreau, Dolan, Martindale, Adelson, Cademartori, McDonald and Welter have agreed to work together to deny or otherwise interfere with the Plaintiffs' receipt of the requisite approvals and permits from the LCC, as part of Defendants' scheme to discriminate against Plaintiffs and prevent them from using and enjoying the Property.  Crawford, Boudreau, Dolan, Martindale, Adelson, Cademartori, McDonald and Welter have each acted to further the conspiracy, knowing their concerted efforts acts would achieve their common objective of depriving Plaintiffs of their fundamental rights to engage in lawful business activity and to freely express their religious beliefs.

### e. The 2020 Ongoing Enforcement Activity

69.     Defendants continue to rely on LCC enforcement mechanisms to obstruct

Plaintiffs' operation of the spring mineral water business and tarnish their reputation with false

claims of violations.  Upon information and belief, Cademartori communicates regularly with the

Neighbors to obtain information used to justify enforcement action against Plaintiffs, to advance

the campaign of harassment and discrimination, given the following examples, which strongly

suggest that the Neighbors are working in concert with the Town to keep vigilant watch over the

Property and report any potential violations with local laws.  For example:

> - in February 2020, Cademartori falsely reported to the LCC that she had
> witnessed BCW using heavy equipment to install two water tanks
> within the 100-foot no disturb zone; in fact Cademartori had not
> personally observed BCW "installing" water tanks in the buffer zone, but,
> rather, based her report on pictures that O'Brien had taken of the two
> water tanks, which O'Brien sent to Cademartori when he reported the
> alleged illegal activity;
>
> - in April 2020, Cademartori responded to a neighbor's speculative
> and slanderous complaint that BCW was emptying a tanker truck on
> the Property that might be disposing acid or other harmful cleaning
> chemicals into the wetlands; there was no rational basis to pursue
> that complaint, when Cademartori knew that Plaintiffs have spent
> years trying to protect the Pocahontas Spring water quality as part
> of BCW's legal responsibility to protect a public water supply;
>
> - in May 2020, in response to a neighbor's report, Cademartori accused
> Plaintiffs of unlawfully cutting trees within the 100-foot no disturb buffer
> zone that were either outside the buffer zone or had been approved
> previously by Martindale for removal; she enlisted the LPD to get
> the work stopped, which so intimidated BCW's landscaper that he
> refused to do any future work for BCW; and
>
> - in June 2020, Cademartori issued a Cease & Desist Order based
> upon an alleged installation of a water tank and grading work within
> the 100-foot no disturb buffer zone, when the challenged tank did
> not store water, had never been installed but simply placed on the
> ground, and had not caused any alteration of the 100 foot buffer
> based upon its placement, and the challenged fill and grading work
> were done pursuant to prior verbal instructions from Cademartori to BCW.

70.     Cademartori's enforcement activities were not related to any rational government purpose or legitimate conservation needs, but were done to further harass and intimidate Plaintiffs.  Cademartori's enforcement work on behalf of the LCC has disrupted BCW's business operations and damaged its business reputation as a reliable source of pure, clean mineral water. Both BCW's customers and its contractors have expressed concern and fear to Gattineri, about why police come to the Property and whether the Pocahontas Spring will remain in business.

71.     Upon information and belief, Adelson, Cademartori, Martindale, McDonald and Welter have agreed with the other Defendants to use their positions at the LCC to pursue enforcement action against Plaintiffs for activity that other residents of Lynnfield freely do, in furtherance of the Town's policy of harassing and discriminating against Plaintiffs because of Gattineri's ethnicity, national origin and religious beliefs.   Upon information and belief, Defendants have all agreed to use the facade of legitimate LCC enforcement activity to prevent Plaintiffs from operating the spring mineral water business and from exercising their religious freedom, in violation of Plaintiffs' constitutional rights.

**2.  ZBA Enforcement**

72.     Crawford, Boudreau (former Town Administrator), Dolan (current Town Administrator), Curtin (Assistant Town Administrator), Breen (Chief of Police), Barrasso (Administrative Assistant to the Building Department) and O'Callaghan (current Building Inspector) have used the enforcement authority of the Lynnfield Building Department ("Building Department") and the Lynnfield Zoning Board of Appeals ("ZBA") to deprive Plaintiffs of their right to freely use and enjoy the Property and to cover up the Town's discriminatory policy with the cloak of apparently legitimate enforcement activity.  Beginning at least in August 2016, the Neighbors began filing multiple complaints and requests for enforcement against Plaintiffs for

26

alleged zoning violations.  In furtherance of Defendants' plan to shut Plaintiffs' business

operations down and cause Plaintiffs to leave town, Crawford, Boudreau, Dolan, Curtin, Breen,

Barrasso and O'Callaghan have encouraged and facilitated the Neighbors' complaints, in order

to deploy their protected petitioning activity to push enforcement action, intended to prevent

Plaintiffs from lawfully using the Property as it has been used since 1901.

### a. The June 2017 Request

73.    Emails Plaintiffs obtained as part of the Sievers' Settlement in November 2019

document that in May and June 2017, Breen met with the Neighbors to discuss Plaintiffs and

what enforcement actions to take against them.  During the conversation, Breen assured the

Neighbors he would support any complaint they filed with the Building Inspector, who was John

Roberto ("Roberto") at that time.  The Neighbors were excited and relayed their plans to

Boudreau, Crawford, Curtin and Barrasso.  Relying on these conversations, the Neighbors filed a

complaint on June 6, 2017, identifying multiple bogus violations by BCW.

74.    Boudreau, Crawford, Curtin and Barrasso communicated with each other about

the complaint and how to coordinate their positions to facilitate the Neighbors with their request

for enforcement against BCW.  Although Roberto did not find a single zoning violation and,

therefore, denied the request for enforcement, Crawford, Boudreau, Curtin and Barrasso

nevertheless advised, and thereby encouraged, the Neighbors about how to appeal the decision to

the ZBA.

75.    Plaintiffs were unaware of the Town's involvement with and support of the

Neighbor's complaints against them.

76.    Also in June 2017, while the Neighbors' request for enforcement was still before

the Building Inspector, Plaintiffs met with Boudreau, Town Counsel and Roberto to review their

plans and solicit the Town's support for their efforts to restore the spring water business that had

been operating from the Pocahontas Spring since 1901.  Gattineri had requested that Breen also

attend the meeting, so the Lynnfield Police Department would understand the work to be done,

but Breen chose not to participate.  Gattineri expected the Town to be receptive to his plans for a

revitalized commercial spring water business, with its likely generation of tax revenues and

community goodwill, and he sought to build a positive working relationship with the Town.

Although the Town officials at the meeting gave Gattineri their assurances of support, in fact

they were empty promises.

77.     Unbeknownst to Gattineri, while he was seeking to enlist support for his plans,

Crawford, Boudreau, Curtin, Barrasso and Breen were advancing their scheme to deprive

Plaintiffs of their civil rights and drive them out of Town through the petitioning activity of the

Neighbors.  These Defendants told the Neighbors of the meeting with Gattineri and promised to

let them know how it went.  In stark contrast, these Defendants never told Plaintiffs about their

communications with and commitment to the Neighbors.  The disparate treatment of Gattineri

compared to the Neighbors was the result of the Town's policy of discrimination against

Gattineri, because of his Italian ethnicity and heritage and the malicious rumors Defendants had

spread about his ties to organized crime.

78.     In furtherance of their agreement to use the Neighbors to invoke the Building

Department's enforcement power, Barrasso and Curtin helped the Neighbors file their appeal to

the ZBA.  Barrasso also notified the Neighbors of the ZBA hearing date for their appeal.

Significantly, Barrasso did not send Plaintiffs a notice of the ZBA hearing date.

79.     Over the next several months, at the Town's direction, the Neighbors propelled

the campaign of harassment and discrimination against Plaintiffs by distributing flyers and

emails that falsely claimed BCW planned to destroy the neighborhood and encouraged public opposition to BCW at the ZBA hearings.  In November 2017, the Neighbors withdrew the appeal, however, after they realized the ZBA was without jurisdiction to hear it because they had failed to identify what zoning regulations BCW had violated or what decision of the Building Inspector they were appealing.

80.     The harassment and ridicule Gattineri sustained while the June 2017 request for enforcement was pursued caused Gattineri to remove all Native American symbols and spiritual artifacts from the Property.  Gattineri did so in an attempt to protect himself from the prejudice and discrimination that he had endured.

### b.  The May 2018 Request

81.     A year later, the Town again facilitated the Neighbors' petition for enforcement action against BCW to advance the policy of discriminating against Plaintiffs in an effort to drive them out of Town.  The May 2018 complaint alleged the same violations as the previous year and sought not only to prevent BCW from operating the spring mineral water business, but also to force BCW to remove all tangible commercial items and raze the buildings on the Property. The May 2018 complaint contended that BCW was illegally using the Property in a residentially zoned district and that the Property did not benefit from any grandfathered protections.

82.     Roberto again denied this request, finding that the Pocahontas Spring water business pre-existed zoning, that the business operations had not been unlawfully extended, and that no abandonment had occurred.  Upon information and belief, the Town, through Curtin and Barrasso and under the direction of Crawford and Dolan, again encouraged and facilitated the Neighbors in taking an appeal to the ZBA.

83.     At its November 2018 hearing, the ZBA affirmed the Building Inspector's

decision that BCW was a legal, pre-existing, nonconforming use of the Property that benefitted

from grandfather protection.  BCW's use of the Property as a commercial spring mineral water

company was the same use as the Smith family had begun and that had continued since 1901,

which involves self-service and delivery to individual, residential and commercial customers.

84.     Despite Plaintiffs' clearly established right to use the Property as a spring mineral

water business, the ZBA also determined, with advice from Town Counsel, that BCW was not a

public water supply within the meaning of the Town's Zoning Bylaw (the "Bylaw").  BCW had

argued that, regardless of whether or not it enjoyed grandfathered protection, the Bylaw's "Table

of Use Regulations," which allows a public water supply as a by right use in a residentially

zoned district, exempted BCW from the zoning regulations.  Upon information and belief, under

pressure from Crawford and Dolan, the ZBA rejected BCW's argument and disregarded the

MassDEP's designation of the Pocahontas Spring as a public water supply under its regulations.

The ZBA ruled:

> The meaning of "public water supply" … is a matter of first
> impression.  … The Board interprets the term "public water
> supply" under the Bylaw to mean a water system operated by
> a public sector entity (such as either of the two water districts
> that provide water to Lynnfield) as opposed to a commercial
> water supply.  Accordingly, by unanimous vote, the Board
> finds that the commercial spring water operation at the Site
> is not a by right use under the Bylaw.

85.     The ZBA reached this conclusion to unilaterally target BCW – despite Plaintiffs'

explicit intent to use the Property as it has historically been allowed to be used – to advance the

Town's policy of discriminating against Plaintiffs in order to drive them out of Town.  The

Bylaw's list of exempt uses does not restrict the term "public water supply" or limit the

exemption to only public sector, non-commercial entities. The Bylaw's list of exempt uses in fact explicitly includes commercial uses, listing, for example, commercial golf courses.

86.     Upon information and belief, Crawford, Dolan, Curtin and Barrasso agreed to use their positions and authority in the Town to encourage and facilitate the Neighbors' petitioning activity against Plaintiffs, to cover up their involvement with the scheme to prevent BCW from operating as a commercial spring mineral water business and drive them out of Town. Upon information and belief, these Defendants agreed to advance the Town's policy of discriminating against Plaintiffs because they stood to benefit from the Town's use of the water supply that feeds the Pocahontas Spring on BCW's Property.

### c. The June 2020 Enforcement Actions

87.     In June 2020, O'Callaghan became the new Building Inspector following the retirement of Roberto. In furtherance of Defendants' conspiracy to implement the Town's discriminatory policy against Plaintiffs, O'Callaghan immediately began issuing cease and desist orders to BCW for alleged violations of local and state regulations and threatened to impose daily fines for failure to comply with the orders. The bases of the orders were meritless.

88.     O'Callaghan has charged Plaintiffs with multiple purported violations based upon BCW's legitimate business activities, which similarly situated residents of Lynnfield are not charged for doing, for example:

> - BCW has been cited for violating state and local noise ordinances restricting the parking and operation of trucks, including idling the engine for more than five minutes and using compression air brakes; in every instance, BCW was performing routine work with its trucks and using them as other businesses in Lynnfield are allowed to use their trucks;
>
> - BCW was charged with improper lighting for its use of spotlights and the failure to have electrical work inspected. BCW, however, had not done electrical work on the Property that required a permit or inspection. BCW's

31

allegedly improper spotlights and string lights were the same as those its
neighbors were using and were not causing improper glare into the road or
any neighbor's yard.

- BCW was charged with constructing a sign without first obtaining a
building permit in violation of the Town's ordinance governing the size,
placement and purpose of signs.  The sign in fact is a plaque adjacent to
a religious statue, which does not violate the size, placement or purpose
restrictions of the ordinance.

- O'Callaghan determined BCW had unlawfully extended the use of the
Property by installing two water tanks, when no installation had occurred
and the tanks are exempt from zoning enforcement.

89.     These enforcement orders were issued with the intent of intimidating Plaintiffs

and coercing them into giving up their efforts to restore the Property and bring the Pocahontas

Spring up to 21st century standards for best manufacturing practices and protection of a public

water supply.  O'Callaghan's misuse of his enforcement authority to advance Defendants'

scheme has further violated Plaintiffs' civil rights, by continuing to cause them unnecessary

delays and costs.

90.     Despite BCW's adherence to the Bylaw and its good faith efforts to reach an

agreement with O'Callaghan that the cease and desist orders were unwarranted or resolved,

O'Callaghan has refused to withdraw them.  By insisting on enforcement of these baseless

charges, O'Callaghan has acted arbitrarily and with malice to advance the Town's discriminatory

policy against Plaintiffs, causing them to waste time and money and preventing them from

operating the spring mineral water business on the Property that they invested in over six years

ago.

91.     In July 2020, O'Callaghan denied Plaintiffs' request for a permit to do emergency

work to repair the springhouse foundation and replace its roof.  Plaintiffs have been attempting to

do this work for years but have repeatedly been denied permits even after the work has been

approved.  The work was included in the May 2017 NOI, and approved as part of the negotiated April 2019 FOC, but the permit needed to commence the work cannot issue because the April 2019 FOC has been held up by Town officials, allegedly because of Plaintiffs' failure to pay the fine for the bogus June 2019 Enforcement Order.  In 2019, Plaintiffs' structural engineer determined that the foundation repair work was urgent, which prompted the August 2019 NOI that is tied up in appeals based on the LCC's refusal to authorize the work.  A year later, in the summer of 2020, both O'Callaghan and Cademartori have conditioned their respective authorization of the work on the other's approval, further delaying Plaintiffs' ability to repair the springhouse.

92.     Plaintiffs are required under state law to make the structural repairs to the springhouse, in order to protect the public water supply, which both Cademartori and O'Callaghan know but which has not convinced either of them to issue the requisite permits. Cademartori and O'Callaghan have abused their positions to arbitrarily withhold permits to allow Plaintiffs to do the work, with the intent to deny Plaintiffs an economically meaningful use of the Property.  Cademartori and O'Callaghan have deliberately caused this protracted delay to further Defendants' agreement to implement the Town's policy of discriminating against Plaintiffs because of the animus towards Gattineri, in order to deprive Plaintiffs' of their fundamental rights and drive them out of Town.

93.     Related to the springhouse work was Plaintiffs' need to replace pipes running from the springhouse to the bottling house.  Plaintiffs obtained LCC approval to do the pipe work in 2018, but delayed commencing the work until they got approval for the springhouse repair work, because of the risk to the foundation that digging up the ground would create. Finally, in June 2020, with continued delays on the permitting for the springhouse foundation

repairs, Plaintiffs gave up their wait and commenced the pipe repair work.  Cademartori

contacted Plaintiffs in an effort to stop the already-approved work, claiming she needed to

inspect the site even though the regulations did not require any further inspection or review.

94.     While doing the pipe work, Plaintiffs discovered that cross connections in the

pipes had been cut, to feed water from the Pocahontas Spring to neighboring properties.  For

several years, Gattineri has sought information from the LBOH about which adjacent properties

had wells and what the source of their water was, in particular the water to the immediate

abutters at 163 and 175 Lowell Street.  For years, McRae has not provided Gattineri with any

records, claiming there were no available records.  Documents produced in response to

Plaintiffs' public records request show, however, that McRae has worked with LCWD to prevent

Gattineri from discovering which lots had wells.  Gattineri's discovery of the cross cuts indicated

that neighbors had been using water from the Pocahontas Spring rather than from a well.  Upon

information and belief, McRae had misrepresented the status of LBOH's records to prevent

Gattineri from learning that the Pocahontas Spring in fact has supplied water to residents in

Lynnfield like the other water districts in Town do.  McRae misinformed Gattineri as part of her

agreement with the other Defendants to discriminate against him and deny him of his

fundamental rights, in order to drive him out of Town and prevent BCW from operating a

commercial spring operation on the Property.

95.     Upon information and belief, Crawford, Boudreau, Dolan, Curtin and Barasso

agreed with O'Callaghan to cover up their discriminatory animus and legitimize their harassment

of Plaintiffs under the guise of legitimate Building Department enforcement action.  Those same

Defendants agreed to work in concert with Cademartori and McRae, to deploy the power of the

LCC and the LBOH to throw more hurdles in Plaintiffs' path, deliberately, to obstruct their efforts to create a viable commercial spring mineral water operation from the Property.

96.     Upon information and belief, all Defendants agreed to effectuate the Town's policy of harassment and discrimination against Plaintiffs under the guise of legitimate enforcement actions, to prevent Plaintiffs from freely using and enjoying the Property.

### 3.  LPD Enforcement

97.     Upon information and belief, Breen implemented the Town's policy of discriminating against Plaintiffs by directing his subordinates not to assist Plaintiffs and threatening that positions would be lost if they did.  In furtherance of Defendants' agreement to prevent Plaintiffs from freely using and enjoying the Property, at Breen's direction, the LPD has adopted a practice of responding to complaints about Plaintiffs and ignoring complaints made by Plaintiffs.  Similarly, the LPD has also adopted a practice of investigating Plaintiffs' activities as purportedly reported to them, but not investigating concerns Plaintiffs have reported.  Upon information and belief, under Breen's orders, the LPD has misplaced or destroyed reports of calls and complaints that Plaintiffs made, has created reports with materially false information or omissions, and has disregarded Plaintiffs' calls for assistance.

98.     Under his authority as Chief of Police, Breen has directed the LPD not to give Plaintiffs the same protection that has been given to other Lynnfield residents, in furtherance of the scheme to discriminate against Gattineri because of his ethnicity, national origin and religion.

### a.  Unequal Enforcement Against Plaintiffs

99.     On multiple occasions, the LPD has responded to complaints about Plaintiffs' work and activities on the Property, allegedly in violation of local ordinances, zoning and conservation regulations, and LCC enforcement orders.  As part of Defendants' conspiracy, the

power of the LPD has been deployed to intimidate Plaintiffs and deter BCW's customers, in

order to deprive Plaintiffs of their right to operate a commercial spring water business.

100.    The LPD has come to the Property at the behest of the LCC or in response to calls

from neighbors that Gattineri was unlawfully doing work in the buffer zone, when Plaintiffs

were merely doing maintenance work that BCW was authorized to do and which, notably, other

Lynnfield residents regularly do without interference from the LCC or the police.  For example:

> - in June 2017, the LPD accompanied Adelson to the Property
> to stop reportedly unlawful tree cutting, but the tree cutting was
> taking place outside the LCC's 100-foot buffer zone and was
> necessary to clear electrical lines;
>
> - in July 2018, the LPD responded to another report of unlawful
> work within the 100-foot buffer zone, when Gattineri had no
> equipment and was manually removing invasive vines and weeds,
> which Martindale had authorized him to remove;
>
> - in June 2019, the LPD came again to investigate when Gattineri
> was merely pruning dead branches and vines;
>
> - in July 2019, the LPD responded to a report that Gattineri
> was using "heavy equipment" within the protected 100-foot
> buffer when he was using a tractor lawnmower to cut grass;
>
> - in April 2020, the LPD arrived with multiple cruisers to issue
> a cease and desist order for allegedly unlawful grading and tree
> clearing that, in fact, was either outside the 100-foot buffer zone
> or had been approved by Martindale on a prior meeting at the Property
> with Gattineri; the LPD forced BCW's work to stop immediately and
> frightened BCW's contractors, who informed Gattineri they would not
> continue to work for him because of the LPD's intimidating tactics.

101.    In contrast, the LPD has not responded when Gattineri has reported clear evidence

of illegal activity within the buffer zone.  Once Gattineri photographed freshly cut trees that were

within ten feet of the wetlands on Lynnfield Greenbelt Association property ("Greenbelt").  He

sent the pictures to Adelson, who took no action against the Greenbelt.  Another time, Gattineri

reported that a tree from the Greenbelt property fell on the hillside near the cross on BCW's

Property, which is within BCW's 100-foot no disturb zone.  Neither the LCC nor the LPD has

taken any enforcement action against Greenbelt, despite the trees having fallen in November

2017. The June 2019 Enforcement Order, however, imposed a $25,000 fine on BCW for

indiscernible disturbance of natural debris on the forest floor in the exact same area.

102.    On July 16, 2019, in response to Plaintiffs' inquiry about why the LPD was not

responding to their calls for enforcement, Breen advised Gattineri that LCC enforcement was

outside his jurisdiction.

103.    In addition to LCC enforcement work, on several occasions, the LPD has come to

BCW to investigate alleged violations of zoning regulations and local ordinances, when

Plaintiffs were peacefully using the Property like other residents of Lynnfield are allowed to do

without interference from the police.  For example:

> - on June 24, 2018, the LPD questioned Gattineri about a complaint
> that water  "was running out at the spring," when Gattineri was giving
> away water to people walking in a multiple sclerosis fundraiser;
>
> - on August 20, 2018, around midnight, the LPD investigated the Property
> for a noise complaint; footage from BCW's security camera showed that
> no customers were at the spring around the time of the reported noise
> and that, when the police arrived, they found no one on the Property and
> no evidence that a perpetrator had been there;
>
> - in September 2019, the LPD responded to a public indecency
> charge based on a BCW worker allegedly urinating; when the LPD
> arrived to investigate, they frightened the BCW workers, but found
> the report was inconclusive and did not press charges;
>
> - on November 18, 2019, the LPD responded to a complaint about fire
> and drumming on the Property, when Gattineri was burning incense
> and praying for his father who had passed away just three days earlier;
> the police report then erroneously stated that no action was taken because
> the matter involved an ongoing dispute between the neighbors;
>
> - on November 19, 2019, the LPD responded to another noise complaint
> based on Gattineri moving a tractor lawnmower and backing up a truck;
> the LPD responded by ordering Gattineri not to start intentional disturbances.

104.    The LPD also has investigated petty, baseless complaints about vehicles on the

Property.  A neighbor once bragged about how she successfully got the LPD to order Gattineri to

remove a van from the Property.  In all instances, the vehicles were, or are, owned by Plaintiffs

and are used as part of their ongoing business operations.

105.    The LPD's show of force is intended to, and does in fact, intimidate Gattineri as

well as the contractors and customers who are on the Property.  Customers have expressed

concern and fear about why the police are there.  Contractors have refused to continue working

for Plaintiffs to avoid interference from the police.  Upon information and belief, Defendants

have used this tactic to tarnish Gattineri's reputation and impede BCW's business operations, in

furtherance of the conspiracy to prevent Plaintiffs from enjoying the value of the Property, in

violation of their constitutional rights.

106.    Under Breen's direction, the LPD has unequally enforced Lynnfield ordinances

and regulations against Plaintiffs and unfairly deployed police power to investigate Plaintiffs,

because of the false rumors about Gattineri's purported association with organized crime.  In

furtherance of Defendants' scheme to implement the Town's policy of discrimination by hiding

behind apparently legitimate enforcement activity, Breen has authorized the LPD to treat

Plaintiffs differently than similarly situated residents of Lynnfield, in violation of their right to

equal protection of the law guaranteed by the Fourteenth Amendment of the United States

Constitution.

### b.  Failure to Protect Plaintiff

107.    Breen has also advanced the policy of discrimination against Plaintiffs by failing

to protect Plaintiffs, in violation of their equal protection rights.  Gattineri has reported

trespasses, suspected burglaries, and desecration of religious artifacts on the Property, yet to date

not a single perpetrator has been identified for any incident.  Upon information and belief, all, or

nearly all, of the reports that Gattineri has made have not even been investigated.

108.    Gattineri has called the LPD on numerous occasions to report that "No

Trespassing" signs posted on the Property had been torn down and that trespassing had occurred.

The LPD has not yet taken any enforcement action related to any of the trespass complaints,

including the below examples:

> - unannounced site visits from the LCC constitute trespassing and
> have been reported to the LPD, from August, October and December
> 2016, May 2017, June 2019, July 2019, and May 2020; the LPD has
> not pressed any charges purportedly because Breen has taken the
> position that conservation enforcement is outside his jurisdiction;
>
> - on June 28, 2017, a person trying to break into the springhouse
> door was captured on BCW's security cameras and reported to
> the LPD, but no investigation was done;
>
> - Gattineri reported neighbors trespassing in May 2017, March
> 2019, November 2019 and January 2020; the LPD did not investigate
> based upon "inconclusive" evidence despite direct evidence of
> invasion from eyewitnesses, videos and photographs;
>
> - on May 23, 2018, another neighbor trespassed and hid on the
> Property to film Gattineri and two customers, including a Native
> American, both of whom were frightened and chose not to return
> to the spring; the LPD declined to investigate claiming it was a
> "private issue" related to a land dispute between neighbors;
>
>  - on July 12, 2019, Welter arrived early in the morning, took pictures,
> and then ran away when Gattineri inquired what she was doing; Gattineri
> reported the trespass, showed the LPD photos of her car that nearly hit
> him and asked for them to investigate, but again the LPD chose not to
> investigate; Gattineri only discovered that the intruder was Welter and
> that she worked for the Town by expending his own resources on
> attorneys who obtained the information for him;  and
>
> - Gattineri has made numerous reports of security cameras being torn
> down and of wires to the cameras being cut, but the LPD has ignored
> those reports and never determined who committed this vandalism.

109.    Upon information and belief, the LPD deliberately chose not to investigate these

incidents because they involved Gattineri and occurred on BCW's property.  Under Breen's

direction, the LPD chose not to protect but, rather, discriminated against, Gattineri because of his

ethnicity, national origin and religious beliefs.

110.    The LPD policy of failing to protect Plaintiffs extends to its failure to investigate

Gattineri's reports of hate crimes.  Gattineri asked the LPD to watch over and respond to

incidents concerning the Property involving, among other things, the religious artifacts that are

displayed there.  Gattineri has both Native American and Roman Catholic religious symbols on

the Property, which have been vandalized and broken.  The desecration includes, for example:

> - a Native American prayer pole was taken out of the ground,
> broken in half and thrown into a pool in the wetlands;
>
> - statues of the Blessed Mother/Virgin Mary have been broken
> on three occasions, in December 2018, February and June 2019,
> and on a fourth occasion was removed from its place by the
> springhouse door and left upside down next to a bench; and
>
> - a cross enrobed with a black cloth, which was attached to the
> springhouse door for the season of Lent in 2019, was dismantled
> and left on the ground.

111.    Each time, Gattineri reported these acts of desecration to the LPD, but the LPD

failed to protect Gattineri's religious freedom and to investigate this vandalism, in clear violation

of Gattineri's constitutional rights.

112.    Upon information and belief, at Breen's direction and in furtherance of

Defendants' scheme to drive Plaintiffs out of Town, the LPD has chosen not to document

Gattineri's reports of these hate crimes and requests for protection against them.  For example,

on July 6, 2019, when the police came to investigate an alleged violation of a cease and desist

order regarding yard work – which was determined to be unfounded – Gattineri reported that a

40

statue of the Blessed Mother had been broken and asked that it be investigated; the police report

from their visit to the Property that day does not include any reference to Gattineri's reported

vandalism and request for investigation.

113.    Gattineri has been told that members of the LPD have called him a "tree nazi" and

a "kook."

114.    Upon information and belief, at Breen's direction and under his control, the LPD

has deliberately failed to treat Plaintiffs like similarly situated residents of Lynnfield, because of

Gattineri's ethnicity, national heritage and religious beliefs.  The LPD has implemented this

policy of unequal protection in furtherance of the agreement among all Defendants to implement

the Town's policy to discriminate against Plaintiffs, to prevent them from operating a

commercial spring mineral water business and otherwise enjoying the benefits of their Property,

in violation of Plaintiffs' constitutional rights.

## D.    The Requests for Public Records

115.    In furtherance of the conspiracy to deprive Plaintiffs of their constitutional

rights, Defendants have failed to comply with Plaintiffs' requests for public records in the

timeframe the statute requires, in order to cover up the Town's policy of discrimination

against Gattineri because of his ethnicity, national origin and religious beliefs.

116.    Gattineri asked Adelson (then Director of Planning and Conservation) for

all documents in the LCC's possession related to the Property, BCW or himself in August

2016, when the LCC was prosecuting its July 2016 Enforcement Order.  Gattineri has

since learned that Adelson misrepresented to him that she had no documents or other

information related to Plaintiffs, the Pocahontas Spring or the Property.  Upon

information and belief, Adelson falsely claimed there were no documents when Gattineri

41

requested them to prevent his discovery of Defendants' scheme to discriminate against Plaintiffs and to deny them of their right to freely use and enjoy the Property.

117.    The LCC and the LBOH delayed responding to Plaintiffs' requests for documents that were submitted, through counsel, in September 2016.  Only after Plaintiffs incurred the costs of appealing the matter to the Secretary of the Commonwealth were the documents produced, by the LCC in December 2016 and by the LBOH in late January 2017.  Contrary to Adelson's prior representation to Gattineri, in fact the LCC had in its possession documents and other information related to Plaintiffs, the Pocahontas Spring and the Property.

118.    On July 14, 2017, Plaintiffs also submitted requests for public records to several Town departments, including the Board of Selectmen, the Town Administrator, the Lynnfield Fire Department, the Lynnfield Planning Board, the LPD, and the two water districts in town, as well as supplemental requests to the LCC and the LBOH. Although some documents were produced within the timeframe required by the statute, Plaintiffs had to send multiple follow up emails and letters to prompt a response about when the documents would be produced by the Board of Selectmen, the Lynnfield Center Water District, the LBOH, and the Planning Board.  The documents were not produced to Plaintiffs until several months later, in the fall of 2017.

119.    On January 9, 2020, Plaintiffs served another request for public records with the Town Administrator.   The Town failed to respond within the timeframe set forth in the statute, once again requiring Plaintiffs to send follow up emails and letters to prompt a response.  Documents were made available to Plaintiffs in February 2020.

120.     Among the documents produced were emails between Crawford, Dolan, Cademartori and other Town officials to organize a meeting in December 2019 to discuss Plaintiffs and the Town's erroneous belief that BCW had purchased the Sievers' house at 163 Lowell Street, located immediately adjacent to the Property.  Upon information and belief, as part of Defendants' scheme to cover up the Town's policy of discriminating against Plaintiffs, the December 2019 meeting was organized to circumvent Massachusetts open meeting law, G.L. c. 30A, §§ 18 – 25.  No notice of the meeting was made public, and no agenda, minutes or notes from the meeting were produced.  Upon information and believe, Defendants scheduled this meeting intentionally to avoid having a public discussion about Gattineri and their plans to drive Plaintiffs out of Town.

121.     Upon information and believe, other private meetings between Defendants have been held to discuss Gattineri and how the Town can execute its policy of discrimination and harassment.  Only after Gattineri settled with the Sievers in November 2019 and obtained their private emails did he realize the extent of the Town's efforts to utilize the Neighbors' petitioning activity and to deploy apparently legitimate enforcement activity as a means of disguising Crawford, Boudreau and Dolan's plans, on behalf of the Town, to prevent Plaintiffs from operating a spring mineral water business as had been done for over a century before BCW purchased the Property in June 2014.

122.     The delays in production caused Plaintiffs to incur unnecessary costs, including legal expenses.

123.     Upon information and belief, Defendants delayed producing the requested information in order to cover up the Town's involvement with the enforcement actions pursued by the LCC, the LPD and the Building Inspector.  Upon information and belief,

Defendants delayed producing the requested information in furtherance of their

agreement to harass and discriminate against Plaintiffs, and to prevent Plaintiffs from

operating a commercial spring mineral water business and enjoying the benefits of their

Property, in violation of Plaintiffs' constitutional rights.

### STATEMENT OF CLAIMS

### Count I – Conspiracy to Deprive Plaintiffs' Civil Rights
### in Violation of 42 U.S.C. § 1985(3)
### (Plaintiffs v. All Defendants)

124.    Plaintiffs incorporated by reference Paragraphs 1 through 123 of the Complaint as

if fully set forth herein.

125.    All Defendants agreed to perform acts, which, either directly or indirectly,

advanced a policy of the Town of Lynnfield to discriminate against Plaintiffs for the purpose of

depriving them of their rights guaranteed by the First and Fourteenth Amendments of the United

States Constitution.  Defendants conspired to design and implement this policy to deny Plaintiffs

of their civil rights, because of Gattineri's ethnicity and religious beliefs.

126.    Defendants' scheme combined the political and economic power of Town

officials with the legwork of the Neighbors to propagate false information about Plaintiffs, to

instigate community antipathy towards the Plaintiffs, and to prevent Plaintiffs from enjoying the

benefits of their Property, including their fundamental liberty interests in freedom of contract and

earning a living, freedom to assemble, and freedom to exercise their religion.

127.    Defendants have pursued a campaign of maligning Gattineri's character and

misrepresenting BCW's business activities in furtherance of the Town's policy of discriminating

against Plaintiffs in order to drive them out of Town.  Defendants have insinuated Gattineri's

involvement with criminal activity by, among other things, reporting a hidden office and

suspicious burying of bags on the Property and donations to a fake charity.  Defendants have

used enforcement activity to propagate this false narrative, in order to prevent BCW from

operating the spring mineral water business on the Property and to deny Gattineri his civil rights.

These rumors stemmed from Gattineri's Italian heritage and have caused invidious

discrimination based on his ethnicity and religious beliefs.

128.     In furtherance of their goal to discriminate against Plaintiffs, Defendants have

denied Plaintiffs equal protection of the law.  Defendants have taken enforcement action against

Plaintiffs based upon inaccurate or incomplete reports, which has frightened customers away,

interrupted private spiritual services, and prevented necessary repair and maintenance work from

being done.  Defendants have further denied Plaintiffs equal protection by refusing to investigate

reported trespasses and withholding approvals of site plan and permit applications for work on

the Property without a legal basis for doing so.  This disparate administration of the law has

resulted in Plaintiffs being treated differently than similarly situated residents of Lynnfield.

129.    All Defendants agreed to this plan by performing themselves, or causing to be

performed, acts in furtherance of this plan, with the intent of depriving Plaintiffs of their

constitutional rights.

130.    Defendants knew or should have known that their coordinated efforts to deny

Plaintiffs their civil rights would violate the First and Fourteenth Amendments to the United

States Constitution, because the protection of fundamental rights is clearly established.

131.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs have

suffered substantial damage to their reputation, mental anguish, emotional distress and financial

losses, including but not limited to lost profits, as well as legal expenses of costs and attorney's

45

fees, which they otherwise would not have incurred.  Defendants are jointly and severally liable for the damages their actions and/or omissions caused.

132.    Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

**Count II – Deprivation of First Amendment Right**
**to Freedom of Assembly in Violation of 42 U.S.C. § 1983**
**(Gattineri v. All Defendants)**

133.    Plaintiffs incorporate by reference Paragraphs 1 through 132 of the Complaint as if fully set forth herein.

134.    At all times, Defendants were acting jointly, under color of law, and in furtherance of their conspiracy when they deprived Gattineri of his First Amendment right to assemble.  Defendants' coordinated efforts to cause Town officials from the police department, fire department and conservation commission to interfere with and interrupt Gattineri's gatherings and private worship, based upon false claims and racial animus, violated Gattineri's fundamental right to freely assemble and associate.  These actions of Defendants prevented Gattineri from using his private property to assemble peacefully with Native Americans and others who share his beliefs, in violation of the First Amendment of the United Sates Constitution.

135.    Defendants' conduct has discriminated against Gattineri based upon his religious beliefs, in violation of his First Amendment right to assemble and associate with others who share his beliefs.  Crawford, Boudreau, Dolan, Adelson, Cademartori, Martindale and Breen directly enforced the Town's policy of using LCC and LPD enforcement authority to intimidate

46

and threaten Gattineri and his Native American guests on the Property, by interrupting prayer services, challenging the heritage of the Native Americans, and questioning the sincerity of Gattineri's religious beliefs.

136.    The actions of Defendants were the result of a policy or custom of failing to respect and protect First Amendment guarantees, designed and implemented by the Town of Lynnfield, in order to discriminate against Gattineri.  Pursuant to this policy, Defendants conspired to deliberately and arbitrarily deny Gattineri his freedom to assemble, guaranteed by the First Amendment and made applicable to Defendants by the Fourteenth Amendment.

137.    Defendants knew or should have known that their interference with Gattineri's right to peacefully assemble and associate with Native American individuals and others, on his private property, deprived Gattineri of rights guaranteed by the First Amendment, because the right to assemble is clearly established.

138.    As a direct and proximate result of Defendants' conduct, Gattineri has suffered mental anguish, emotional distress, damage to his reputation and financial losses, including legal expenses of costs and attorney's fees that he otherwise would not have incurred.  Defendants are jointly and severally liable to Gattineri for the damages their actions and/or omissions caused.

139.    Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

**Count III –Deprivation of First Amendment Right
to the Free Exercise of Religion in Violation of 42 U.S.C. § 1983
(Gattineri v. All Defendants)**

140.    Plaintiffs incorporate by reference Paragraphs 1 through 139 of the Complaint as if fully set forth herein.

141.     At all times, Defendants were acting jointly, under color of law, and in furtherance of their conspiracy when they deprived Gattineri of his First Amendment right to the free exercise of his religion.  Pursuant to their agreement to prevent Plaintiffs from enjoying the benefits of the Property and to drive Plaintiffs out of Town, Defendants have used Town enforcement to deny Gattineri his freedom to pray, including but not limited to sending police and fire department employees to the Property when votive candles and incense were burned and quiet liturgical music was playing.  Defendants also have used Town conservation and zoning enforcement against Gattineri's right to express his religious views, by alleging violations based on the placement of a cross, benches and a plaque engraved with religious passages.

142.    Defendants also have denied Gattineri's right to freely exercise his religion by failing to investigate when religious artifacts were desecrated on the Property, including the breaking of a statue of the Blessed Virgin Mary on three separate occasions, the breaking of a Native American prayer pole, and the tearing down of a Lenten cross.

143.    Defendants' conduct has discriminated against Gattineri based upon his religious beliefs, in violation of his First Amendment right to freely exercise his religion.  Defendants' actions and omissions have targeted Gattineri because of his religion and have advanced an anti-religion policy in violation of the Establishment Clause of the First Amendment.

144.    The actions of the Defendants were the result of policy or custom of failing to respect and protect First Amendment guarantees, designed and implemented by the Town of Lynnfield.  Pursuant to this policy, Defendants conspired to deliberately and arbitrarily interfere

with Gattineri's freedom to exercise his religion, guaranteed by the First Amendment and made applicable to Defendants by the Fourteenth Amendment.

145.     Defendants knew or should have known that their interference with Gattineri's right to freely exercise his religion deprived Gattineri of rights guaranteed by the First Amendment, because the fundamental right is clearly established.

146.     As a direct and proximate result of Defendants' conduct, Gattineri has suffered mental anguish, emotional distress, harm to his reputation and financial losses, including legal expenses of costs and attorney's fees, which he otherwise would not have incurred.  Defendants are jointly and severally liable to Gattineri for the damages their actions and/or omissions caused.

147.     Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

## Count IV – Deprivation of Fourteenth Amendment
## Right to Due Process in Violation of 42 U.S.C. § 1983
### (Plaintiffs v. All Defendants)

148.     Plaintiffs incorporate by reference Paragraphs 1 through 147 of the Complaint as if fully set forth herein.

149.     Defendants' sustained, aggressive six-year campaign to prevent Plaintiffs from operating the commercial spring mineral water business from the Property has deprived them of their liberty interests in gainful employment and freedom of contract, in violation of their due process rights guaranteed by the Fourteenth Amendment.  Working together in a coordinated scheme to deny Plaintiffs their right to operate a spring mineral water business on the Property,

49

all Defendants have violated Plaintiffs' substantive due process rights, guaranteed by the

Fourteenth Amendment of the United States Constitution.

150.    Defendants abused their power to seek and impose enforcement orders against

Plaintiffs, for which there was no reasonable basis or legitimate state interest, but instead was

intended to discriminate against Gattineri to prevent Plaintiffs from doing necessary work on the

Property to maintain ongoing business operations, including restoring the foundation of the

springhouse, installing a septic system, replacing piping, upgrading electricity and clearing the

grounds of debris.  Defendants have pursued their plan to use conservation and zoning

enforcement to disrupt and interfere with Plaintiffs' ability to operate the spring mineral water

business in order to unlawfully deny Plaintiffs their liberty interest in enjoying the benefits of

their Property, including earning a living, entering into contracts and engaging in commerce.

151.    The enforcement orders and actions Defendants have taken against Plaintiffs were

instituted and continued maliciously, based upon the religious and ethnic animus of Defendants,

which has resulted in substantial injuries to Plaintiffs.  Defendants have accused Plaintiffs of

violating regulations and enforcement orders, knowing those accusations to be false, with the

intent of exerting influence and causing enforcement action to be taken against Plaintiffs to their

detriment.  These enforcement orders and actions were made with knowledge that they were

unsubstantiated, based upon fabricated evidence against Plaintiffs.

152.    In furtherance of Defendants' agreement to implement the Town's policy of

discrimination against Plaintiffs, Adelson, Cademartori, Martindale and O'Callaghan repeatedly

used their positions of authority to arbitrarily deny Plaintiffs permits to do work that had already

been approved, either by negotiated agreement for example in the April 2019 FOC or the May

2020 oral agreement, or by the MassDEP SOC and state regulations allowing the springhouse

50

repair work.  Adelson, Cademartori and Martindale have abused the review and appeal processes to delay approval of critical work over the course of years, effectively denying Plaintiffs any meaningful use of the commercial spring mineral water business BCW purchased in June 2014, in deliberate and knowing deprivation of Plaintiffs' liberty and property interests.

153.    The actions of the Defendants were the result of the Town's policy or custom of invidious discrimination against Plaintiffs because of Gattineri's Italian heritage and ethnicity and his Catholic and Native American religious beliefs.  Pursuant to this policy, Defendants conspired to deliberately and arbitrarily interfere with Plaintiffs' fundamental liberty interests in freedom to contract and to engage in gainful employment, guaranteed by the due process clause of the Fourteenth Amendment.

154.    Defendants knew or should have known that their coordinated scheme to deliberately interference with Plaintiffs' liberty interests in freely contracting and earning a living deprived them of rights guaranteed by the Fourteenth Amendment, because those fundamental rights are clearly established.

155.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered mental anguish, emotional distress, substantial harm to their reputation and tremendous financial losses, including legal expenses of costs and attorney's fees, which they otherwise would not have incurred.  Defendants are jointly and severally liable for the damages their actions and/or omissions caused.

156.    Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

**Count V – Deprivation of Fourteenth Amendment
Right to Equal Protection of the Law in violation of 42 U.S.C. § 1983
(Plaintiffs v. All Defendants)**

157.    Plaintiffs incorporate by reference Paragraphs 1 through 156 of the Complaint as if fully set forth herein.

158.    Plaintiffs were similarly situated in all relevant respects to other residents of Lynnfield.  Nevertheless, Plaintiffs were treated differently because of Gattineri's ethnicity, national origin and religious beliefs, in violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution.

159.    Defendants' policy of treating Plaintiffs differently denied them of their right to receive equal treatment under the law, including their right to have conservation regulations enforced against them like they are enforced against the Greenbelt and other similarly situated residents of Lynnfield; their right to be protected by the police against trespass and vandalism; their right to use their private property to assemble freely; their right to worship on their private property freely; their right to maintain their private property without harassing interference; and their right to earn a living and enter into contracts.

160.    Defendants' unequal treatment of Plaintiffs was instituted and continued maliciously, based upon the religious and ethnic animus of Defendants, which has resulted in substantial injuries to Plaintiffs.  Defendants have accused Plaintiffs of violating regulations and enforcement orders, knowing those accusations to be false, with the intent of exerting influence and causing enforcement action to be taken against Plaintiffs to their detriment.  These enforcement orders and actions were made with knowledge that they were unsubstantiated, based upon fabricated evidence against Plaintiffs and knowing that they would result in denying Plaintiffs of equal and fair treatment under the law.

161.    The actions of the Defendants were the result of the policy or custom of discriminating against Plaintiffs, by failing to respect and protect Fourteenth Amendment guarantees, designed and implemented by the Town of Lynnfield.  Defendants conspired to use private petitioning activity and governmental enforcement action to cover up the Town's policy to discriminate against Plaintiffs, by deliberately and arbitrarily interfering with their right to equal protection because of their ethnicity and religion, in violation of the Fourteenth Amendment.

162.    Defendants knew or should have known that their denial of Plaintiffs' right to equal protection of the law deprived them of rights guaranteed by the Fourteenth Amendment, because the right to equal protection is fundamental and clearly established.

163.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered mental anguish, emotional distress, harm to their reputation and financial losses, including legal expenses of costs and attorney's fees, which they otherwise would not have incurred.  Defendants are jointly and severally liable for the damages their actions and/or omissions caused.

164.    Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

### Count VI – Failure to Prevent the Conspiracy in Violations of 42 U.S.C. § 1986 (Plaintiffs vs. Crawford, Boudreau, Dolan and Breen)

165.    Plaintiffs incorporate by reference Paragraphs 1 through 164 of the Complaint as if fully set forth herein.

166.    All Defendants conspired to violate Plaintiffs' civil rights.

167.     Defendants Crawford, Boudreau, Dolan and Breen, through their positions with the Town of Lynnfield, knew or should have known of the agreement among Defendants to create and enforce a policy to discriminate against Plaintiffs, in violation of Plaintiffs' First and Fourteenth Amendment rights, and to cover up that policy by enlisting and facilitating the petitioning activity of the Neighbors and the enforcement activity of the LCC, the LPD and the Building Department.  Defendants Crawford, Boudreau, Dolan and Breen knew or should have known about the wrongful acts done to Plaintiffs and, although they were aware of those wrongs, took no action to prevent them.

168.     Defendants Crawford, Boudreau, Dolan and Breen knew that the wrongs conspired to be done were about to be committed, or were committed, and they had the power to prevent or aid in preventing the commission of the same by the exercise of reasonable diligence, but neglected or refused to do so.

169.     As a direct and proximate result thereof, Plaintiffs have incurred damages, including but not limited to loss of business and harm to their reputation, plus legal expenses of costs and attorney's fees, which they otherwise would not have incurred.  Defendants Crawford, Boudreau, Dolan and Breen are jointly and severally liable to Plaintiffs for the damages their actions and/or omissions caused.

170.     Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

### Count VII – Violation of M.G.L. Ch. 12, § 11 I
### (Plaintiffs v. Defendants)

171.     Plaintiffs incorporate by reference Paragraphs 1 through 170 of the Complaint as if fully set forth herein.

172.     All Defendants have performed acts, which, either directly or indirectly, advanced a policy of the Town of Lynnfield to discriminate against Plaintiffs through acts of intimidation, designed for the purpose of depriving them of their rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and the Massachusetts Declaration of Rights. Defendants designed and implemented this policy to deny Plaintiffs of their civil rights, because of Gattineri's ethnicity and religious beliefs.

173.     Defendants' scheme combined the political and economic power of Town officials with the legwork of the Neighbors to propagate false information about Plaintiffs, to instigate community antipathy towards the Plaintiffs, to intimidate Plaintiffs, to seek to coerce Plaintiffs into giving up the Property and leaving Town by preventing Plaintiffs from enjoying the benefits of their Property, including their liberty interests in freedom of contract, freedom to assemble, and freedom to exercise their religion.

174.     In furtherance of their goal to discriminate against Plaintiffs, Defendants have denied Plaintiffs equal protection of the law.  Defendants have taken enforcement action against Plaintiffs based upon inaccurate or incomplete reports, which has frightened customers away, interrupted private spiritual services, and prevented necessary repair and maintenance work from being done.  Defendants have further denied Plaintiffs equal protection by refusing to investigate reported trespasses and withholding approvals of site plan and permit applications for work on the Property.  This disparate administration of the law has resulted in Plaintiffs being treated differently than similarly situated residents of Lynnfield.

175.    By performing acts themselves or causing acts to be performed, all Defendants have used their positions of authority within the Town to intimidate Plaintiffs, with the intent of depriving Plaintiffs of their constitutional rights.

176.    All Defendants acted with malice and bad faith when they chose to perform acts, or failed to perform acts, that denied Plaintiffs their constitutional rights.

177.    Defendants knew or should have known that their efforts to deny Plaintiffs their civil rights would violate the First and Fourteenth Amendments to the United States Constitution, because the protection of fundamental rights is clearly established.

178.    As a direct and proximate result of Defendants' interference with Plaintiffs' civil rights, Plaintiffs have suffered substantial damage to their reputation, mental anguish, emotional distress and financial losses, including but not limited to lost profits, as well as legal expenses of costs and attorney's fees, which they otherwise would not have incurred.  Defendants are jointly and severally liable for the damages their actions and/or omissions caused.

179.    Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

### Count VIII - Violation of Massachusetts Public Records Request, M.G.L. Ch. 66, § 10
### (Plaintiffs v. Defendants)

180.    Plaintiffs incorporate by reference Paragraphs 1 through 179 of the Complaint as if fully set forth herein.

181.    Plaintiffs filed requests for public records, pursuant to Massachusetts General Law, chapter 66, section 10 ("PRR") with the Lynnfield Board of Selectmen, the Lynnfield Town Administrator, the Lynnfield Police Department, the Lynnfield Conservation Commission

and the Lynnfield Board of Health, plus other departments and commissions of the Town. Defendants failed to timely respond to Plaintiffs' PRR's. Defendants failed to respond to Plaintiffs' PRR's until after Plaintiffs pursued their requests, with multiple follow up emails, letters, and even appeals to the Secretary of the Commonwealth.

182. Defendants violated Massachusetts law by failing to timely respond to Plaintiffs' PPR's in July 2017 and January 2020. Defendants failed to produce the requested information within the ten (10) day time period set forth in the statute, and failed to request an extension of time to produce documents as required if the statutory time period cannot be met.

183. As a result of Defendants' violations of the Massachusetts Public Records Request law, Plaintiffs have incurred damages, including attorney's fees, in an amount to be determined at trial. Defendants are jointly and severally liable for the damages their action and/or omissions caused.

184. Plaintiffs are entitled to have all responsive records produced. Based on the documents that Plaintiffs received pursuant to the Sievers' Settlement, Plaintiffs now believe that responsive documents may have been withheld, which Plaintiffs never would have discovered but for the Sievers' Settlement. Defendants have further violated the Massachusetts PRR by failing to thoroughly produce all documents Plaintiffs have requested.

185. Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs. Plaintiffs, therefore, are entitled to punitive damages against Defendants, pursuant to M.G.L. c. 66, § 10A(d).

## Count IX – Tortious Interference with Advantageous Relations
### (Plaintiffs v. Defendants in their Individual Capacities)

186. Plaintiffs incorporate by reference Paragraphs 1 through 185 of the Complaint as if fully set forth herein.

187.     BCW owns and, with Gattineri as its manager, operates a commercial spring mineral water business on the Property and makes sales of water to its customers.  BCW's customers include individuals, businesses and charities.

188.     Defendants know that the Pocahontas Spring has been the source of a commercial spring water business serving business and individual customers throughout the North Shore and Greater Boston area since 1901.  Defendants also know that the commercial spring water business that has operated from the Property for over a century has included both self-service and delivery to its customers.  Defendants are aware of Plaintiffs' business relationship with their customers and their prospective customers, because Defendants know that BCW is authorized to operate a commercial spring mineral water business on the Property under the Lynnfield Bylaw.

189.     Defendants also know that Plaintiffs have engaged in numerous business activities designed to continue to make the Pocahontas Spring a viable commercial business and to restore both the buildings and the grounds on the Property.  Plaintiffs' business relations include contracting with civil engineers, hydro-geologists, equipment suppliers, certified water operators, landscapers, electricians and others.  Plaintiffs have entered into these contracts in order to continue the commercial spring mineral water business and protect the public water supply that BCW purchased in June 2014.

190.     Defendants knew or should have known that Plaintiffs had these business relationships and prospective business relationships, because Plaintiffs have applied for numerous approvals and permits to do work on the Property.  Plaintiffs have provided detailed information in those requests for permits and applications for approvals, which put Defendants on notice that Plaintiffs either had, or would be having, contractual relationships that Plaintiffs needed to continue a viable and thriving commercial spring operation on the Property.

58

191.     Defendants knew or should have known that Plaintiffs were attempting to continue the commercial spring mineral water business on the Property because of the proceedings before the LCC and the ZBA where Plaintiffs publicly presented their plans to the Town of Lynnfield.

192.     In the proper exercise of their positions of authority, Defendants owed Plaintiffs a duty to fairly consider their requests for permits and approvals that were needed to enable them to use and benefit from the Property, as they were constitutionally entitled to do.  Instead, Defendants intentionally and improperly denied Plaintiffs fair consideration of their applications for permits and approvals, because of Gattineri's ethnicity and religion.  Defendants discriminated against Plaintiffs to advance their goal of driving Gattineri out of Town.

193.     All Defendants were acting in their individual capacities when they improperly interfered with Plaintiffs' contractual and advantageous business relations, with the improper purpose of intentionally preventing Plaintiffs from benefiting from those relations because of their animus towards Gattineri, based upon his ethnicity, heritage and religious.

194.     As a direct and proximate result of Defendants' interference with Plaintiffs' existing and prospective business relations, Plaintiffs have suffered substantial damage to their reputation, mental anguish, emotional distress and financial losses, including but not limited to lost profits, as well as legal expenses of costs and attorney's fees, which they otherwise would not have incurred.  Defendants are jointly and severally liable for the damages their actions and/or omissions caused.

195.     Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting

themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced compensatory damages against Defendants.

## Count X – Civil Conspiracy
### (Plaintiffs v. Defendants)

196.    Plaintiffs incorporate by reference Paragraphs 1 through 195 of the Complaint as if fully set forth herein.

197.    Defendants have violated Plaintiffs' civil rights and tortiously interfered with their existing and prospective advantageous business relations.

198.    Defendants have exercised substantial power of coercion over Plaintiffs that they would not have had if each had been acting completely independently and individually.  All Defendants have acted in unison and in concert, by common design and/or agreement, to commit these tortious acts against Plaintiffs.

199.    Plaintiffs have suffered substantial damage to their reputation, mental anguish, emotional distress and financial losses, including but not limited to lost profits, as well as legal expenses of costs and attorney's fees, which they otherwise would not have incurred.  Defendants are jointly and severally liable for the damages their actions and/or omissions caused.

200.    Acting in a wanton, oppressive and/or malicious manner, Defendants committed or failed to commit the actions described above in bad faith, with the intent of benefitting themselves at the expense of Plaintiffs.  Plaintiffs, therefore, are entitled to enhanced

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs pray for judgment against all Defendants as follows:

a.      Enter Judgment in favor of Plaintiffs on all counts asserted in the Complaint;

b.      Order the productions of any and all records that are responsive to the requests for public records that have not been produced to date;

60084116 v1

c.        Award compensatory damages in an amount to be determined at trial, for which all Defendants are jointly and severally liable;

d.        Award enhanced compensatory damages, as Defendants' conduct constitutes conduct that is wanton, malicious and/or oppressive;

e.        Award attorney's fees and costs incurred by Plaintiffs in connection with prosecuting this action, pursuant to 42 U.S.C. § 1988;

f.        Award prejudgment interest as permitted by law; and

g.        Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

BOSTON CLEAR WATER
    COMPANY, LLC and
ANTHONY GATTINERI

Dated:  July 24, 2020

By their attorneys,

    /s/ *Kelley A. Jordan-Price*
Kelley A. Jordan-Price, BBO #565964
HINCKLEY ALLEN & SNYDER
    28 State Street
Boston, MA 02109-1775
617.378.4158
kprice@hinckleyallen.com

    /s/ *Julie K. Connolly*
Julie K. Connolly, NH Bar # 10984*
JULIE CONNOLLY LAW PLLC
P.O. Box 665
Concord, NH 03302-0665
603.496.5927
julie@jkc-law.com
*Application for *Pro Hac Vice*
    Admission to be submitted

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

61