UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY GATTINERI and BOSTON
CLEAR WATER COMPANY, LLC,

               Plaintiffs,

v.

TOWN OF LYNNFIELD,
MASSACHUSETTS, et al.,

               Defendants.

Case No. 1:20-CV-11404-IT

**Leave to File a Memorandum of Law up to 35 Pages Granted on January 27, 2021**

**<u>MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT</u>**

Kelley A. Jordan-Price, BBO #565964
kprice@hinckleyallen.com
Tara A. Singh, BBO #697128
tsingh@hinckleyallen.com
HINCKLEY ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
(617) 345-9000

Julie K. Connolly, NH Bar No. 10984
*Pro Hac Vice*
Julie Connolly Law PLLC
8 Ridge Road
P.O. Box 665
Concord, NH 03302-0665
(603) 496-5927
julie@jkc-law.com

## I.  INTRODUCTION

Boston Clear Water Company, LLC ("BCW") and Anthony Gattineri ("Gattineri") (collectively "Plaintiffs") bring this action to seek redress for the multiple damages caused by Defendants' conspiracy to deprive Plaintiffs of their rights to freely use, enjoy and benefit from their property, in violation of 42 U.S.C. §§ 1983, 1985(3) and 1986, as well as state and common law.  Despite Defendants' oft-repeated refrain that this action is simply another garden variety land use dispute, the First Amended Complaint ("Amended Complaint") does not seek review of any local land use decisions at all.  Instead, the Amended Complaint asserts numerous, detailed factual allegations that demonstrate Defendants' ongoing and coordinated scheme to deprive Plaintiffs of their civil rights and otherwise tortiously interfere with their advantageous business relations, among other claims.  As set forth in more detail below, all grounds for dismissal advanced by Defendants are unavailing. Indeed, the Amended Complaint, spanning seventy (70) pages and one hundred ninety-one (191) paragraphs, does not interfere with any state court proceeding that would require Court abstention, was timely brought and states plausible claims for the relief sought in all counts.  Accordingly, the Court should deny Defendants' Motion to Dismiss in its entirety and allow this action to proceed.

### A.      Factual Background

BCW owns property located at 165 Lowell Street in Lynnfield (the "Property"), where the Pocahontas Spring flows and where a commercial spring water company has operated since the beginning of the twentieth century.  Am. Compl., ¶¶ 7, 28.  In 2014, Gattineri, as the manager of BCW, purchased the Property with the intention of continuing the commercial spring water business and, to that end, has invested hundreds of thousands of dollars and hours to restore the Pocahontas Spring water business and to insure compliance with current regulations.  *Id.* at ¶¶ 28, 29.  Plaintiffs have also sought to restore and protect the Pocahontas Spring, because it has been a spiritually significant healing place

for Native Americans for centuries.  Id. at ¶ 30.  Among other things, Gattineri has created a spiritual/prayer atmosphere at the Property to practice and celebrate his Catholic and Native American spiritual beliefs by himself and with others.  *Id.*

The Amended Complaint details, in 113 paragraphs and 50 pages, the multiple actions undertaken by the Town and certain Town representatives, acting under color of state law, to deprive the Plaintiffs of their civil rights, in violation of 42 U.S.C. §§ 1983, 1985(3) and 1986, as well as tortiously interfering with Plaintiffs' advantageous business relations and other illegal actions, all of which are incorporated herein by reference.  Am. Compl., ¶¶ 1-113. As alleged in the Amended Complaint, over the course of nearly six years, the Defendants, acting under a custom fueled by personal and political animus, have interfered with the Plaintiffs' right to freedom of contract and to earn a living with respect to the commercial spring water business at the Property; have interfered with Gattineri's freedom of assembly and freedom of religion in connection with his religious and spiritual gatherings and practices at the Property; and have otherwise denied the Plaintiffs equal protection under the law, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.  Defendants have also tortiously interfered with the Plaintiffs' advantageous business operations at the Property, causing Plaintiffs to incur significant damages.  *Id.*

### B.     Standard of Review

"A complaint must contain 'a short and plain statement of the claim' Fed. R. Civ. P. 8(a)(2), that 'possess[es] enough heft to show that the pleader is entitled to relief.'"  *Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 2d. 94, 103 (D. Mass. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007)).  In reviewing a complaint under Rule 12(b)(6), the Court accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor.  *Hootstein*, 361 F. Supp. 3d at 103 (citing authority).  "To survive a Rule 12(b)(6) challenge, the allegations 'must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)). A claim is plausible if it gives rise to a reasonable inference that the defendant is liable based on the alleged misconduct. *Hootstein*, 361 F. Supp. 2d at 103. "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## II.  THE COURT HAS SUBJECT MATTER JURISDICTION

### A.      *Younger* Abstention Does Not Apply

Defendants' contention that this Court should abstain from hearing Plaintiffs' claims because ongoing state proceedings involve matters "echoed throughout the Amended Complaint," *see* Defendants' Memorandum of Law in Support of Motion to Dismiss ("MOL") at 7 (ECF No. 54), is as factually off-base as it is legally wrong. This argument should be discarded for the red herring that it is.

The *Younger* abstention doctrine requires federal courts to refrain from exercising jurisdiction over matters that interfere with certain state proceedings. *See Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 189 (1st Cir. 2015) (citing *Younger v. Harris*, 401 U.S. 37 (1971)). The doctrine presents an exception to the general rule "that federal courts have a virtually unflagging obligation … to exercise the jurisdiction given them" and is limited by "the settled premise that the pendency of a state-court action generally does not preclude a federal court from addressing the same subject matter." *Sirva Relocation, LLC*, 794 F.3d at 191 (citing *Co. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976) and *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-18 (1996) (internal quotations omitted)). Although *Younger* directs that abstention may be appropriate where an ongoing state judicial proceeding "implicates important state interests and provides an adequate opportunity to raise federal defenses," *Sirva Relocation, LLC*, 794 F.3d at 192 (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar*

*Ass'n*, 457 U.S. 423, 432 (1982)), federal courts should abstain from interfering with only three types of state proceedings: (1) criminal prosecutions; (2) "civil proceedings that are akin to criminal prosecutions," and (3) proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sirva Relocation, LLC*, 794 F.3d at 192 (quoting *Sprint Commc'ns., Inc. v. Jacobs*, 571 U.S. 69(2013)).  "If a proceeding does not fit within this taxonomy, *Younger* abstention will not lie." *Sirva Relocation, LLC*, 794 F.3d at 192 (quoting *Sprint Commc'ns., Inc.*, 134 U.S. at 593-94).

Here, there is no pending state proceeding that falls within the *Younger/Sprint* taxonomy, which ends the analysis.  *See, e.g., L'Europa v. R.I. Div. of State Fire Marshal*, 2018 U.S. Dist. LEXIS 101955, *4 (D. R.I. June 19, 2018) (explaining *Sirva Relocation, LLC*'s three-step approach to abstention analysis).  The case on which Defendants rely, *Mullane v. Morrissey*, *see* MOL at 8, does not support a contrary conclusion, because the state enforcement proceedings there fell squarely within the *Younger/Sprint* taxonomy.  *See id.*, 2020. U.S. Dist. LEXIS 42144, at *7-9 (D. Mass. Mar. 11, 2020) (finding no bad faith to warrant an exception to *Younger* abstention). Defendants erroneously contend that the Amended Complaint challenges decisions of the Lynnfield Conservation Commission ("LCC"), the Lynnfield Building Department, and Lynnfield Zoning Board of Appeals ("ZBA"); however, nothing in the Amended Complaint alleges, or reasonably gives rise to the inference, that Plaintiffs seek reversal of the decisions of the LCC, the Building Department or the ZBA.  Instead, Plaintiffs assert multiple claims of discrimination, mounted against them by Defendants in a coordinated scheme to deny Plaintiffs their constitutional rights.  These federal claims are beyond the jurisdictional authority of the LCC, the Building Inspector and the ZBA and, therefore, are not at issue in any of the pending state court proceedings.  It is indisputable that the Amended Complaint invokes this Court's federal question subject matter jurisdiction, which the Court should properly exercise to hear Plaintiffs' claims.  *See*

*Sirva Relocation, LLC*, 794 F.3d at 191 (citing authority to explain "that federal courts have a virtually unflagging obligation … to exercise the jurisdiction given them").

### B.      The Amended Complaint is Not Time-Barred

Defendants postulate that many claims are time-barred, because Gattineri "was aware of several of the municipal actions that undergird his Complaint prior to July 24, 2017," MOL at 10, a date falling three years before Plaintiffs' Complaint was filed.  Plaintiffs agree with Defendants that Massachusetts' three-year statute of limitations governs § 1983 complaints.  *See Poy v. Boutselis*, 352 F. 3d 479, 483 (1st Cir. 2003) (applying the forum's state law governing limitations for personal injury actions unless contrary to federal law); *see also* M.G.L. ch. 260, § 2A.  However, based on the allegations throughout the Amended Complaint, which must be accepted as true, it is patently clear that this § 1983 action did not accrue until well after July 24, 2017.  *See Rodriguez Narvaez v. Nazario*, 895 F.2d 38, 41 n.5 (1st Cir. 1990) (measuring time period from when plaintiff knows or should know of the injury giving rise to the claim); *see also Tomaselli v. Beaulieu*, 967 F. Supp. 2d 423, 451 (D. Mass. 2013) (explaining Massachusetts discovery rule); *Govan v. Trustees of Bos. Univ.*, 66 F. Supp. 2d 74, 80 – 81 (D. Mass. 1999) (applying discovery rule to federal civil rights case).

Defendants' argument ignores the numerous, detailed allegations in the Amended Complaint describing when and how Gattineri discovered the Town's plan to deprive Plaintiffs of their constitutional rights through Defendants' coordinated misconduct.  The vast majority of the factual allegations pertain to events that occurred after July 24, 2017.  *See, e.g.,* Am. Compl., ¶¶ 50–73 (conservation-related allegations), 80–95 (zoning-related allegations), 97–100, 105, 107 (police-related allegations), 111–113 (records-request-related allegations).  These multiple and various incidents caused Plaintiffs' injuries that gave rise to their federal and state law claims.  All of the factual allegations are

incorporated into each of Plaintiffs' claims, *see id.*, ¶¶ 114, 122, 131, 140, 149, 157, 163, 170, 174, 184, thus precluding dismissal of any claim based upon the statute of limitations.

The allegations that predate July 24, 2017 are also not time-barred, because Plaintiffs did not discover their constitutional injuries until more than two years later, when documents were obtained pursuant to Plaintiffs' entry into the Sievers Settlement Agreement on November 25, 2019 (the "Sievers Settlement"). *See* Am. Compl., ¶¶ 32, 34–43, 49, 75–79. As alleged, until Gattineri received those documents, he did not know about Defendants' coordinated scheme to deprive him of his constitutional rights.[1] Accepting as true the allegations in the Amended Complaint, Defendants deliberately sought to cover up their involvement with the Neighbors' petitioning activity and to conceal the Town's orchestration of the harassment Plaintiffs suffered, by hiding behind the façade of legitimate enforcement activity and by delaying, and even withholding, the production of documents Plaintiffs requested that would have revealed the Defendants' agreement to discriminate against Plaintiffs and deprive them of their civil rights. Defendants' efforts to prevent Plaintiffs from discovering the plan to drive Plaintiffs out of Town, by obstructing BCW's operation and by retaliating against Gattineri for exercising his constitutional rights, tolled the statute of limitations. *See Tomaselli*, 967 F. Supp. 2d at 442 (tolling limitations period when wrongful conduct is concealed); *see also* M.G.L. c. 260, § 12 (providing fraudulent concealment of misconduct tolls the statute of limitations).

The Amended Complaint overwhelmingly demonstrates that none of Plaintiffs' claims are time-barred. Plaintiffs have alleged discriminatory acts that began at least as early as 2015 and that continue to this day, which they could not have discovered until after the Sievers Settlement on November 25,

---

[1] At this same time, Gattineri also learned of a secret meeting that occurred in December 2019 between various Town officials, including at least Defendants Crawford, Dolan and Cademartori, to discuss how the Sievers Settlement might impact the Defendants' scheme to drive Plaintiffs out of Town. *See* Am. Compl., ¶¶ 41–42.

6

2019.  Whether under a fraudulent concealment theory, *see id.*, the continuing violation doctrine, *see Bettencourt v. Town of Mendon*, 344 F. Supp. 3d, 468, 483 n.7 (D. Mass. 2018) ("The purpose of the doctrine is to ensure that a plaintiff's claims are not foreclosed in circumstances where a plaintiff needed to see a pattern of mistreatment before becoming aware that earlier individual acts were, indeed, discriminatory."), or as a systemic violation, *see id.* at 489-90 ("A plaintiff claiming a systemic violation bears the burden of demonstrating that a discernible discriminatory policy was in effect, and injured her, during the limitations period." (internal quotations omitted)), Plaintiffs' claims are ripe for review.

## III.  PLAINTIFFS HAVE STATED VIABLE CLAIMS

### A.     The Federal Law Claims[2]

#### 1.     Plaintiffs' Allegations State a Claim for Municipal Liability.

Defendants next argue that the Amended Complaint should be dismissed against the Town and the Town Officials in their official capacities – namely Phil Crawford ("Crawford"), James Boudreau ("Boudreau"), Robert Curtin ("Curtin") and Winnie Barrasso ("Barrasso") – because the allegations do not show that Plaintiffs' injuries were caused by any Town policy.  *See* MOL at 11–12.  Defendants submit that Plaintiffs advance a "final authority" theory of municipal liability but fail to identify the source of policymaking authority in order to tie in the Town and fail to recognize that Crawford cannot act alone to tie in the other Town officials.  Defendants' argument rings hollow, because it is not, nor could it be, substantiated by a single cite to the Amended Complaint, as Plaintiffs allege that Defendants

---

[2] Defendants contend that "A Number of Infirmities Are Common to Plaintiffs' Several Civil Rights Claims," MOL at 8–9, arguing that Plaintiffs have failed to state a viable claim under the due process clause and have failed to allege intentional misconduct by certain Defendants.  Plaintiffs, however, do not allege a procedural or substantive due process violation, but instead assert their Fourteenth Amendment claims under the equal protection clause.  Contrary to Defendants' bald assertion, the Amended Complaint includes numerous allegations against the listed individuals – Curtin, McRae, Breen, O'Callaghan, Barasso, McDonald and Welter – which exceed the notice pleading requirements of Federal Rule of Civil Procedure 8(a) and which are identified, *infra*, within the discussion of the various claims.

followed a widespread and well-settled municipal custom, *not a policy*, when the constitutional violations occurred.

To state a claim for municipal liability against the Town based on a custom, Plaintiffs must allege first, that the custom or practice is so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice, and second, that the custom was the cause of and the moving force behind the deprivation of constitutional rights. *See Roma Const. Co. v. aRusso*, 96 F.3d 566, 575 (1st Cir. 1996) (citing authority); *see also Doe v. Town of Wayland*, 179 F. Supp. 3d 155, 171-72 (D. Mass. 2016) (same).

The Amended Complaint is replete with allegations describing the widespread and long-standing practice amongst Defendants to use their positions within the Town to interfere with Plaintiffs' right to operate a commercial spring water business and with Gattineri's rights to freedom of association and religion, and to conceal their discriminatory animus towards Plaintiffs behind the façade of legitimate enforcement activity. *See, e.g.,* Am. Compl. ¶¶ 3, 31 – 34, 36, 38, 41, 43–44, 48–50, 52–65, 69–71, 73–79, 82–85, 90, 92, 94–96, 103–06, 112 – 13. These allegations readily meet the pleading standards for the causation prong of a claim for municipal liability. *See Doe*, 179 F. Supp. at 172 (inferring custom caused the constitutional violations based on facts alleged). The Amended Complaint also repeatedly alleges that Crawford directed and worked together with Boudreau and Dolan, who in turn enlisted the work of Curtin, Breen, Adelson, Cademartori, O'Callaghan and the other Defendants, as well as Town officials, agents and employees, to execute the plan to drive Plaintiffs out of town through a campaign of harassment and discrimination. These allegations describe a sufficiently pervasive and coordinated scheme among several Town officials to satisfy the pleading requirements for a municipal custom. *See id.* at 173 (finding allegations of serial misconduct or a systemic pattern of activity states a custom-based

claim for municipal liability); *see also Roma Const. Co.*, 96 F.3d at 576 (finding custom based on coercive extortion activities of several city officials).

### 2. Plaintiffs State Viable Civil Rights Claims Predicated on First Amendment Violations.

Contrary to Defendants' contention, Counts I and II of the Amended Complaint state viable claims for violations of 42 U.S.C. § 1983 against <u>all</u> Defendants for deprivation of Gattineri's First Amendment Rights of Freedom of Assembly (Count I) and Free Exercise of Religion (Count II).

To plead a cognizable Section 1983 claim predicated on a First Amendment violation, Gattineri must set forth the following elements: (1) that he was engaged in constitutionally protected conduct; (2) that Defendants subjected him to an adverse action; and (3) that the protected conduct was a substantial or motivating factor in the adverse action. *Doe by & through Doe v. Hopkinton Pub. Sch.*, No. CV 19-11384-WGY, 2020 WL 5638019, at \*5 (D. Mass. Sept. 22, 2020) (citing *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). The Amended Complaint satisfies all three elements with respect to both types of First Amendment claims asserted.

First, the Amended Complaint appropriately alleges that Gattineri was engaged in constitutionally protected conduct – i.e., the right to peaceably assemble and the right to free exercise of religion, and Defendants concede as much. *See* MOL at 13; *see also Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 139-140 (1987) (First Amendment Free Exercise Clause is applicable to the State through the Fourteenth Amendment); *S. Bos. Allied War Veterans Council v. City of Bos.*, 875 F. Supp. 891, 912 (D. Mass. 1995) (citing *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988) ("The ability and opportunity to combine with others to advance one's views is a powerful practical means of ensuring the perpetuation of the freedoms the First Amendment has guaranteed against the government.").

Second, it is well established that there is no heightened pleading requirement in civil rights

cases and that notice pleading suffices.  *See, e.g., Pagan v. Calderon*, 448 F.3d 16, 31 (1st Cir. 2006).

Far beyond notice pleading standards, the Amended Complaint sets forth, in detail, over the course of

fifty-one (51) pages and 113 paragraphs, specific factual allegations of multiple adverse acts to which

Gattineri has been subjected based on his exercise of First Amendment rights – at the hands of the

Defendants in connection with their roles on the Board of Selectmen, the LCC, the Lynnfield Board of

Health ("LBOH"), the Lynnfield Police Department ("LPD"), the Building Department, among other

capacities, and, further, that the protected conduct was a substantial or motivating factor in the adverse

actions taken.  *See, e.g.,* Am. Compl., ¶¶ 2, 3, 31-37, 42-49, 52, 55-57, 59, 60-65, 69-71, 73, 79, 80, 82-

88, 90, 92, 93, 95, 96, 103, 106-110, 114-130.  The Defendants largely ignore these allegations,

pointing, instead, to excerpts from just six paragraphs of the Amended Complaint.[3]  The Court must, of

course, accept <u>all</u> well-pleaded facts as true and draw all reasonable inferences therefrom in Gattineri's

favor, and not just focus on Defendants' cherry-picked, highlighted ones.  *See, e.g., Saldivar v. Racine*,

818 F.3d 14 (1st Cir. 2016).

   In an attempt to brush aside the myriad adverse actions alleged, Defendants sweepingly contend

that "Gattineri's association with Native Americans and his free exercise of religion are not immune

from local zoning and health related oversight."  MOL at 14.  Defendants' statement embraces a

wholesale mischaracterization of what the Amended Complaint actually alleges:  Gattineri does not

claim that he is *immune* from local zoning and health related oversight.  Rather, Gattineri alleges, in

detail, the Defendants' multiple, deliberate deprivations of his constitutionally protected rights and their

abuses of power, undertaken under the guise of legitimate enforcement efforts.  *See generally* Am.

---

[3] Defendants contend that, to the extent certain cited events occurred prior to July 24, 2017, they are time barred.  As discussed at pages 5-7, *supra*, Plaintiffs did not learn – and could not have learned – of their causes of action until after November 25, 2019, and, as such, the limitations period did not accrue until that time.  *See, e.g., Moran Vega v. Cruz Burgos,* 537 F.3d 14 (1st Cir. 2008).

Compl., ¶¶ 11-113.  Moreover, far from being "few" and "unobtrusive," as Defendants contend, these actions, as plead, comprise a "well-settled and widespread custom."  Am. Compl., ¶ 126.

Defendants also suggest, without any legal support, that a viable First Amendment claim requires a showing of outright "prohibition" of, rather than "interference" with, First Amendment rights.   To be actionable, interference with First Amendment rights can arise where a plaintiff has been placed under substantial pressure to modify its behavior, which is precisely what is alleged here.  *See, e.g.*, *New Life Baptist Church Academy v. Town of E. Longmeadow*, 885 F.2d 940, 944 (1st Cir. 1989) (citing *Hobbie*, 480 U.S. at 141  (1987)); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (noting that Free Exercise Clause prevents "covert suppression of particular religious beliefs") (internal citations omitted); *Delaney v. Town of Abington*, 890 F.3d 1, 6 (1st Cir. 2018) ('[e]ven 'relatively minor events' can give rise to [Section] 1983 liability, as long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights").  The allegations in the Amended Complaint allege that the Defendants' conduct has had a chilling effect on Gattineri and the activities he engages in on the Property and, thus, "plausibly allege conduct amounting to harassment that might deter a reasonable individual from exercising their First Amendment Rights."[4]  *R.I. Seekonk Holdings, LLC v. Hines*, 425 F. Supp. 3d 37, 44-45 (2019).[5]

Finally, the Defendants contend that the Amended Complaint does not allege any intentional

---

[4] Defendants suggest Gattineri lacks standing because he cannot pursue claims on behalf of his Native American guests. Gattineri is pursuing his own claims that arise, in part, from his association with Native Americans.  Indeed, Gattineri has alleged that he has both suffered and is threatened by an injury to a cognizable interest and that his injury is causally connected to the Defendants' actions, which is sufficient to confer standing on him to assert his claims.  *Calderone*, 448 F. Supp. at 27.

[5] Defendants curiously cite to the Supreme Court case of *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 767 (2005), to claim that Police Chief Breen/LPD's failure to investigate destruction of a sacred religious statute on the Property is not actionable under Section 1983.  *Castle Rock* presented a 14th Amendment due process claim and considered the application of Section 1983 purely in that context.  As noted *supra*, Defendants do not assert a due process claim in the Amended Complaint, making reliance on *Castle Rock* inapposite.

misconduct with respect to certain individual Defendants.  MOL at 9.  Here, too, Defendants have

chosen to ignore the well-pled allegations in the Amended Complaint.  The Amended Complaint does,

in fact, allege how each individual defendant, acting under color of state law, violated Gattineri's

constitutional rights.  *See, e.g., West v. Atkins*, 487 U.S. 42, 50 (1988) (noting that "generally, a public

employee acts under the color of state law while acting in his official capacity or while exercising his

responsibilities pursuant to state law"). *See, e.g.*, Am. Compl., ¶¶ 10, 32, 33, 37-41, 43, 46, 50, 53- 55,

57, 59, 70, 74, 75, 77, 78, 82, 84, 85, 91, 92, 94-96 (Crawford); ¶¶ 12, 33, 39, 40, 43, 46, 50, 53, 55, 57,

59, 70, 74, 75, 77, 78, 95, 96 (Boudreau); ¶¶ 11, 33, 39, 40, 41, 43, 59, 70, 82, 84, 85, 91, 92, 94-96

(Dolan);  ¶¶ 13, 40, 50, 53- 55, 57, 59, 70, 74, 75, 77, 78, 82, 95, 96 (Curtin); ¶¶ 14, 46, 50, 74, 75, 77,

78, 96, 99, 103, 104, 106, 108, 110 (Breen); ¶¶ 15, 46-49, 50, 52, 55, 57, 58, 59, 60, 62-64, 67, 69, 70,

73 (Martindale); ¶¶ 16, 38, 45-50, 52, 55, 57, 59, 69-71, 73, 95, 97, 98, 112 (Adelson); ¶¶ 17, 36, 37, 41,

58-60, 62, 63, 64, 67, 69, 70-73, 88, 95, 97 (Cademartori); ¶¶ 18, 31, 37, 46, 50, 55, 79, 90, 95, 112

(McRae); ¶¶ 19, 74, 85, 88, 95 (O'Callaghan); ¶¶ 20, 39, 50, 74, 75, 77, 78, 82, 84, 95 (Barrasso); ¶¶ 21,

62, 63, 69, 70, 73 (McDonald); and ¶¶ 22, 69, 70, 73 (Welter).  These cites to the Amended Complaint

readily demonstrate Plaintiffs have satisfied their pleading requirements to state the claims asserted.

### 3.     The Amended Complaint States a Claim for Retaliation / Deprivation of the 14th Amendment Right to Earn a Living

In Count III, Plaintiffs assert that their fundamental right to earn a living has been violated by

Defendants' protracted scheme to interfere with Plaintiffs' efforts to revitalize the Pocahontas Spring

and operate a commercial mineral water business.  *See* Am. Compl., ¶ 133.  Defendants attempt to

undermine Plaintiffs' claim by mischaracterizing it as a claim for the "unfettered right to use and enjoy

his property without restriction," MOL at 17, and arguing there is no fundamental right to pursue a

livelihood under either a substantive due process or an equal protection theory, MOL at 16.[6]

Defendants' argument is once again unavailing, because Plaintiffs have stated a viable retaliation claim

based on the deprivation of their constitutional right to earn a living.  *See, e.g., Wentworth Precious*

*Metals, LLC v. City of Everett*, 2013 WL 441094, at *5 (D. Mass. Feb. 4, 2013) (rejecting defendant's

attempt to recast plaintiff's claims).

A retaliation claim is grounded on the principle that the government cannot deprive an individual

of a valuable government benefit in response to the exercise of constitutional rights.  *Id.* at *4 (citing

*Lynch v. Boston*, 180 F.3d 1, 13 (1st Cir. 1999)).  To state a § 1983 claim for retaliation, Plaintiffs must

show (1) that they engaged in constitutionally protected conduct, (2) that they suffered an adverse

action, and (3) that the constitutionally protected conduct was a substantial or motivating factor for the

adverse action.  *Id.* at *4 (citing authority).  "The touchstone of any retaliation claim is whether 'the

defendants' action would deter a reasonably hardy individual from exercising his constitutional rights.'"

*Id.* (quoting *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).

Plaintiffs allege facts that demonstrate all three elements of a retaliation claim.  First, both

BCW's and Gattineri's rights to pursue a livelihood and enter into contracts are fundamental liberty and

property interests protected by the Constitution.  *See Piper v. Supreme Court of N.H.*, 723 F.2d. 110, 112

(1st Cir. 1983), *aff'd,* 470 U.S. 274 (1985) (recognizing the right under the privileges and immunities

clause of Article IV, § 2, applicable to the States through the Fourteenth Amendment); *see also*

---

[6] The very case on which Defendants rely to claim that there is no fundamental right to pursue the livelihood of one's choosing actually supports Plaintiffs' claim.  *See Medeiros v. Vincent*, 431 F.3d 25, 33 n.3 (1st Cir. 2005), abrogated on other grounds*, Bond v. United States*, 564 U.S. 211 (2011) (citing precedent to recognize the fundamental right to earn a living under the privileges and immunities clause).  The plaintiff in *Medeiros* lost his claims that new regulations violated equal protection and substantive due process, because the court determined that the restriction imposed on fishing was rationally related to the legitimate government interest in conserving the Atlantic lobster population. *See id.* at 32-33.

*Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1ˢᵗ Cir 2011) ("We have repeatedly recognized the severity of depriving someone of their livelihood." (quoting *FDIC v. Mallen*, 486 U.S. 230, 243 (1988)). In *Piper*, the First Circuit explained the privileges and immunities clause to include, among other things:

> the clause applies "to basic and essential activities, interference with which would frustrate the purpose of the formation of the Union.  Among those protected interests, the Court clearly counted the individual's 'right to pursue a livelihood in a State other than his own, a right that is protected by the Privileges and Immunities Clause.'"

*Id.*, 723 F.2d at 112 (quoting *Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 386-87 (1978) (citing *Toomer v. Witsell*, 334 U.S. 385 (1948)).

The Amended Complaint describes in great detail the adverse consequences Plaintiffs have suffered for the past six years because of Defendants' discriminatory animus towards Gattineri and their desire to access the Pocahontas Spring water for the Town's own purposes, which satisfies the second and third elements of a retaliation claim.  *See, e.g.,* Am. Compl. ¶¶ 44, 47–48, 51–55, 58–59, 67–71, 78–79, 83–85, 89–93, 95.

### 4.  The Amended Complaint States a Claim for Selective Enforcement / Deprivation of Equal Protection in Violation of the 14ᵗʰ Amendment.

Defendants next contend that Plaintiffs have failed to state a claim for the deprivation of their rights to equal protection of the law.  Contrary to Defendants' assertions, Count IV appropriately sets forth the elements of a selective enforcement equal protection claim.[7]

As an initial matter, Defendants mischaracterize the equal protection claim as presenting a garden variety local land use dispute.  MOL at 18.  As noted above, this case presents no local land use claims but, rather, asserts claims for constitutional violations and other wrongs committed by the Defendants, including Count IV, which seeks redress for equal protection violations based on selective

---

[7] Defendants also contend that Plaintiffs' failure to protect argument does not constitute a violation of the due process clause.  MOL at 21.  As noted earlier, however, Plaintiffs are not making a due process claim.  *See* n.2, *supra*.

14

enforcement.[8]  To state such a claim, Plaintiffs must allege (1) that they were selectively treated compared to others similarly situated, and that the selective treatment was either (2) based upon impermissible considerations such as race, religion, an intent to inhibit or punish the exercise of constitutional rights, or (3) done with malicious or bath faith intent to injure a person.  *See Wentworth Precious Metals, LLC*, 2013 WL 441094 at *8 (citing *Yeradis' Moody St. Restaurant & Lounge v. Bd. of Selectmen*, 878 F.2d 16, 21 (1st Cir. 1989)).  Plaintiffs also "must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate the [plaintiffs] were singled out for unlawful oppression." *Id.* (quoting *Rubinovitz v. Rogato,* 60 F.3d 906, 909-10 (1st Cir. 1995)).  The Amended Complaint satisfies all of these elements.

Plaintiffs' similarly situated allegations are twofold.  First, they allege that they are similarly situated to all the other residents and businesses in Lynnfield, to the extent that they are entitled to equal protection under and enforcement of the law.  Second, Plaintiffs allege that they are similarly situated to the Greenbelt property, a portion of which, like the Property, is located in the Wetlands buffer zone. Am. Compl. ¶ 98.  The Amended Complaint then recites multiple examples of when and how both the LCC and the LPD have selectively enforced Town ordinances and regulations against Plaintiffs or otherwise deprived Plaintiffs of equal protection through failures to respond to reports of trespass and vandalism on the Property.  *See, e.g.,* Am. Compl., ¶¶ 45–73, 96–110.  Plaintiffs allege that they have been subjected to this selective enforcement *because* of Gattineri's Italian ethnicity, which Defendants surmised tied him to organized crime; Gattineri's religious beliefs, in particular his association with Native Americans and adoption of Native American spirituality; and Plaintiffs' efforts to operate their

---

[8] Defendants further argue that Plaintiffs cannot rely on the equal protection clause to "challeng[e] a discretionary benefit."  MOL at 18.  Plaintiffs make no such challenge in this action.  Plaintiffs' claims are based on constitutional rights that are not "discretionary."

commercial business on their Property.  *See, e.g.,* Am. Compl., ¶¶ 3, 45, 73, 80, 87, 96, 143–144.  As discussed at length, *infra, see* III. B. § 5, selective treatment of Plaintiffs based upon Gattineri's religion, or Plaintiffs' efforts to operate a commercial spring water business, are impermissible considerations. *See Wentworth Precious Metals, LLC*, 2013 WL 441094 at *11. The Amended Complaint literally abounds with allegations, too numerous to cite, about Defendants' scheme to discriminate against Plaintiffs, with the intent to inhibit or punish them for exercising their constitutional rights.  The allegations of retaliation discussed above, *supra*, III.B § 4, also demonstrate malice or bad faith intent to injure to support Plaintiffs' selective enforcement claim.  *See id.* at *12 ("Even in the absence of a showing of invidious discrimination or that defendants' selective enforcement is based on an intent to punish for exercising a constitutional right, a plaintiff can establish a viable equal protection claim with evidence of bad faith or malicious intent to injure.")

### 5.   The Amended Complaint States a Viable Claim for Conspiracy to Deprive Plaintiffs of their Civil Rights.

In Count V, Plaintiffs assert a claim under 42 U.S.C. § 1985(3), which provides a civil remedy for conspiracies to interfere with constitutionally or federally protected rights when motivated by invidiously discriminatory animus.  *See Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971).  "A civil rights conspiracy is commonly defined as 'a combination of two or more persons acting in concert to commit an unlawful act ... the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another.'" *Parker v. Landry*, 935 F.3d 9, 17 (1st Cir. 2019) (quoting *Estate of Bennett*, 548 F.3d at 178)).  A viable Section 1985(3) claim must contain the following four elements: (1) a conspiracy; (2) a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property, or a deprivation of a constitutionally protected right.  *Perez-Sanchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008) (citing *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)).  Regarding this last requirement, the plaintiff

"must allege facts showing that (1) the defendants conspired against [him] because of [his] membership in a class, and (2) the criteria defining the class are invidious." *Burbank v. Town of Hubbardston*, 146 F. Supp. 3d 402, 405 (D. Mass. 2015).  The Amended Complaint squarely satisfies all of these pleading requirements.

With respect to the "conspiracy," the Amended Complaint more than adequately sets forth "at least minimum factual support of the existence of a conspiracy." *Francis-Sobel v. Univ. of Me.*, 597 F.2d 15, 17 (1st Cir. 1979); *see Slotnick v. Garfinkle*, 632 F.2d 163, 165-66 (1st Cir. 1980) (per curiam). According to Defendants, the Amended Complaint "does not contain facts which expressly allege an agreement among the several Town Officials to violate Gattineri's constitutional rights nor does it contain facts from which such an agreement can be inferred."  MOL at 22.  To be clear, "[a]n express agreement among all conspirators is <u>not</u> a necessary element of a civil conspiracy as long as the participants in the conspiracy share a general objective or the same motives for desiring the intended conspiratorial result." *Maslow v. Evans*, No. 00-CV-5660, 2003 WL 22594577, at *24 (E.D. Pa. Nov. 7, 2003) (citing *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979)).  "To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was a 'single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" *Id.* (quoting *Hoffman–Larouche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971)).

Defendants appear to have misread the Amended Complaint, as allegations of the conspiratorial agreement among the Defendants are peppered throughout the entire Amended Complaint.  Given page length constraints, it would be impossible to detail each and every allegation discussing the agreement reached by the Defendants (and others) to violate Gattineri's constitutional rights, and the following citations are to just a few, out of multiple, allegations that are readily apparent from a review of the Amended Complaint.  *See, e.g.*, Am. Compl., ¶ 2 ("[t]his action arises out of the ongoing, concerted

17

efforts by Defendants and others to interfere with [Gattineri's] constitutional rights"); ¶ 34 ("Plaintiffs

came to learn that Defendants agreed to work together and enlisted the help of or otherwise encouraged

private citizens to harass Plaintiffs, in furtherance of Defendants' plan to deprive Plaintiffs of their civil

liberties"); ¶ 43 (noting that the "agreement amongst Defendants began as early as the fall of 2014 and

continues to this day"); ¶ 44 ("Defendants have abused their positions, knowing their acts were

coordinated with one another"); ¶ 59 (referencing "Defendants' concerted efforts"); ¶¶ 74, 78, 106, 108

(referencing conspiracy to advance scheme to drive Plaintiffs out of town); ¶¶ 84, 88, 90, 96, 110, 113

(referencing Defendants' agreement to discriminate); ¶¶ 149-150 (Count V, incorporating all factual

allegations in the Amended Complaint and identifying the agreement entered into by the co-

conspirators).[9]

It has also long been established that a claim under Section 1985(3) requires "some racial, or

perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."

*Griffin*, 403 U.S. at 102; *see also Aulson*, 83 F.3d at 4; *Rua v. Glodis*, 52 F. Supp. 3d 84, 99 (D. Mass.

2014).  Defendants contend the Amended Complaint is devoid of any "allegations whatsoever that 'the

criteria defining the class are invidious."  MOL at 22.   Once again, a review of the Amended Complaint

defies Defendants' contention.  The Amended Complaint quite clearly alleges Gattineri's membership in

two distinctive, identifiable groups:  his Italian ethnicity and his Catholic/Native American religious

beliefs.  *See, e.g.*, Am. Compl., ¶ 43 (noting Defendants' "animus against Gattineri's Italian ethnicity

and Catholic and Native American religious beliefs").  Furthermore, in the text of Count V itself, the

Plaintiffs specifically allege that the multiple overt acts undertaken in furtherance of the conspiracy

---

[9] Defendants also claim, in footnote 29, that the "Amended Complaint contains no allegations that certain Town Officials committed any 'overt act' at all . . ."  Defendants, again, ignore the specific allegations setting forth the actions undertaken by each named defendant and, further, that Count V specifically incorporates all such allegations, which necessarily also includes those allegations in the "overt acts" identified.

"have caused *invidious discrimination* based on [Gattineri's] ethnicity and religious beliefs."  Am. Compl., ¶ 152 (emphasis supplied).  These allegations are sufficient to state a viable claim.  *See, e.g., Aulson,* 83 F.3d at 4 (holding that a class is cognizable for purposes of Section 1985(3)'s class-based animus requirements when it is comprised of a distinct and identifiable group); *see also Brokaw v. Mercer Cty.,* 235 F.3d 1000, 1024 (7th Cir. 2000) (Section 1985(3) claim predicated on religious animus*); LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (citing legislative history of Civil Rights Act as supporting claim based on religious animus); *Taylor v. Gilmartin,* 686 F.2d 1358 (10th Cir. 1982) ("Whether the defendants were in fact motivated by the alleged animus against religious minorities is, of course, a question for the jury"); *Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981) (religious discrimination falls within the ambit of Section 1985(3)).

### 6.    The Amended Complaint States a Viable Section 1986 Claim.

Plaintiffs have not only pled a viable "conspiracy" claim under 42 U.S.C. § 1985(3), they have also set forth a viable derivative claim against Crawford, Boudreau, Dolan and Breen under 42 U.S.C. § 1986 for failure to prevent or aid in preventing the conspiracy.

Defendants' attack on the Section 1986 claim is essentially twofold.  First, Defendants claim that Plaintiffs' Section 1986 claim is time barred – an argument that fails for the very same reasons as those set forth, *supra*, at pages five through seven.  Second, Defendants claim that because the LCC, ZBA, and the Lynnfield Historical Commission ("LHC") are neither overseen by nor report to the Board of Selectmen, Town Administrator or Police Chief, Defendants Crawford, Boudreau, Dolan and Breen are immune from Section 1986 liability. This argument also fails, because the plain language of Section 1986 clearly demonstrates an intent to reach individuals not only having power to "prevent" the conspiracy, but also having power to "***aid in preventing*** the commission of the same. . ."  42 U.S.C. § 1986 (emphasis supplied).

Section 1986 imposes liability for negligence on persons who have knowledge of "wrongs visited upon persons, and although aware of the wrong, took no action." *Thomas v. News World Comn's*, 681 F. Supp. 55, 72 (D.D.C. 1988). As set forth in the Amended Complaint, Crawford, Boudreau, Dolan and Curtin not only had knowledge of the misconduct, but they also failed to take any steps to aid in preventing the misconduct. To the contrary, they used their positions to do the exact opposite – further and advance the misconduct. *See, e.g.,* Am. Compl., ¶ 27 (setting forth powers of Board of Selectmen, for which Crawford is a member and exercised control); ¶ 40 (alleging that in December 2019, Plaintiffs learned that "Crawford, Boudreau, Dolan [and] Curtin. . . use their position, and then coordinate all Defendants to use their position, against Plaintiffs . . . [to] interfere with Plaintiffs' constitutional rights under the guise of legitimate enforcement and petitioning activity"). Defendants' argument also fails to acknowledge the investigatory powers held by these four individuals – something set forth in the Amended Complaint allegations that "Crawford, Boudreau, Dolan and Breen . . . took no action to prevent [the wrongful acts] notwithstanding having the authority under the Town's Charter and By-laws to investigate the misconduct of any town department, office, or agency." Am. Compl., ¶ 159; *see also id*., ¶ 160 (alleging these Defendants "had the power to prevent or aid in preventing the commission of the [wrongful acts] by the exercise of reasonable diligence, but neglected or refused to do so"). *See, e.g., Santiago v. City of Philadelphia*, 435 F. Supp. 136, 156 (E.D. Pa. 1977) (finding viable Section 1986 claim where "defendants have some authority, although limited, to control policies and practices"). The Amended Complaint amply sets forth a viable Section 1986 claim against Crawford, Boudreau, Dolan and Curtin.

**B.      Defendants Cannot Avail Themselves of Qualified Immunity**

Defendants contend that the individual Defendants are entitled to Qualified Immunity because "[n]otwithstanding Gattineri's religious and spiritual connection to the [Property] . . ., he is not free from

state or local health, environmental and zoning oversight." MOL at 25-26.[10] While Defendants rely on

their general oversight authority, they have failed to identify a single Town bylaw, provision of the

Town Charter, or other law that would justify the individual Defendants' abhorrent behavior against

Plaintiffs. As explained herein, Plaintiffs have alleged how Defendants violated their constitutional

rights of freedom of assembly (Count I), free exercise of religion (Count II), the fundamental right to

earn a living (Count III), and equal protection of the law (Count IV). Each of these rights have long

been clearly established, such that each individual Defendant knew or should have known that his or her

conduct violated Plaintiffs' civil rights. *See, e.g.*, *Gonzalez-Droz*, 660 F.3d at 13 (right to earn a living

is constitutionally protected property interest); *Bell v. Mazza*, 394 Mass. 176, 178 (1985) (recognizing

constitutional "right to own land and to use and improve it according to [her] conceptions of pleasure,

comfort or profit, and the exercise of liberty and the pursuit of happiness"); *Walsh v. Town of Lakeville*,

431 F. Supp. 2d 134, 152 (D. Mass. 2006) (plaintiff's right to use and enjoy her property is clearly

established right); *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 44 (1st Cir. 2016) (discussing

"[a]mong the 'essential precepts' of the Establishment Clause are [that the state cannot] force [a person]

to profess a belief or disbelief in any religion," and "[n]o person can be punished for entertaining or

professing religious beliefs or disbeliefs."); *Ramirez v. Arlequin*, 447 F.3d 19, 22 (1st Cir. 2006) ("[T]he

government may not . . . punish [persons] for exercising their right of association.").

To the extent the individual Defendants dispute Plaintiffs' characterization of their actions and

their roles in the conspiracy to deprive Plaintiffs of their civil rights, this raises factual issues that are not

---

[10] Defendants also claim that Gattineri cannot establish that the "constitutional rights at play here are 'clearly established'" because he entered into a stipulated Preliminary Injunction with the Town. MOL at 25. As explained in the Amended Complaint, the stipulated order does not cover the broad scope of conduct at issue in this case, and Gattineri entered into the stipulated order as part of a "good faith effort to work with the Town and avoid the ongoing expense of litigation," with a reservation of all rights and defenses. Am. Compl., ¶ 86. The stipulated order, therefore, does not undermine Plaintiffs' constitutional claims in any way.

germane to the analysis under Rule 12(b)(6) and so cannot now support dismissal based on qualified immunity.  *See McCue v. City of Bangor, Maine*, 838 F.3d 55, 61–62 (1st Cir. 2016); *Maldonado v. Fontanes*, 568 F.3d 263, 267–72 (1st Cir. 2009).  At this stage, the Court should allow Plaintiffs to develop the factual record relating to Defendants' claim of qualified immunity.  *See Alston v. Town of Brookline Massachusetts*, 308 F. Supp. 3d 509, 559 (D. Mass. 2018) ("It is generally unwise . . . to venture into a qualified immunity analysis at the pleading stage because in the majority of cases it is necessary to develop the factual record to test the veracity of the complaint's allegations.") (quoting *Maroney v. Fiorentini*, No. 16-CV-11575-DLC, 2017 WL 6063064, at *8 (D. Mass. Dec. 7, 2017)).

### C.    The Amended Complaint States Viable State Law Claims

#### 1.  Defendants Violated the Massachusetts Civil Rights Act ("MCRA")

"The MCRA provides that any person who interferes, or attempts to interfere, with another's exercise or enjoyment of rights secured by the constitution or laws of the United States or the Commonwealth may be liable, so long as such interference or attempted interference was made by threats, intimidation, or coercion."  *Roberts v. Town of Bridgewater*, No. CV 15-10266-DJC, 2015 WL 4550783, at *6 (D. Mass. July 28, 2015) (internal citations omitted) (citing M.G.L. c. 12, § 11).  To prevail on a MCRA claim, the plaintiff must show that "1) his exercise or enjoyment of rights secured by the federal or state constitutions or laws 2) has been interfered with, or attempted to be interfered with, and 3) the interference or attempted interference was by 'threats, intimidation, or coercion.'"  *Id.* (quoting *Stone v. Caswell*, 963 F. Supp. 2d 32, 37 (D. Mass. 2013)).  The Defendants do not – because they cannot – contend that the individual Defendants' alleged actions did not interfere with Plaintiffs' exercise or enjoyment of rights secured by federal or state law.  *See generally*, MOL at 26-27.  Rather, Defendants assert that the MCRA claim fails because of an absence of allegations of "threats, intimidation, or coercion."  *Id.* at 26-27.  Defendants once again cherry-pick certain allegations while

ignoring the full allegations relating to the individual Defendants' threatening, intimidating and coercive conduct against Plaintiffs.

"In the context of interfering with a person's rights under the MCRA, a threat 'involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . .' 'Intimidation involves putting in fear for the purpose of compelling or deterring conduct,' and 'coercion involves the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'"  *Doe v. Town of Stoughton*, No. 17-CV-12337-IT, 2018 WL 1951180, at *4 (D. Mass. Apr. 25, 2018) (quoting *Planned Parenthood League v. Blake*, 417 Mass. 467, 474 (1994)) (internal citations omitted).  Count VII of the Amended Complaint adequately states a claim under the MCRA against the individual Defendants and details the individual Defendants' threatening, intimidating and coercive behavior.  For example, Plaintiffs allege:

- On October 22, 2016, the "show of force" by the LCC and the Lynnfield Police Department "threatened and intimidated Gattineri and BCW's workers and interrupted business operations, at significant cost to Plaintiffs.  Am. Compl., ¶¶ 47, 102.

- "[T]he Town had used Martindale and Adelson's authority to inspect the Property following the July 2016 Enforcement Order as a mechanism to intimidate, and thereby interfere with, Gattineri's freedom of religion and association to advance the Town's scheme to drive Plaintiffs out of town . . . ." *Id.* at ¶ 49.

- In August 2017, Adelson, Martindale and others, came to the Property when Gattineri "had Native American guests there, whom Adelson and Martindale proceeded to confront and challenge about their heritage and ethnicity. . . . The encounter so intimidated Gattineri and his Native American guests that they determined it was not safe for the Native Americans to be at the Pocahontas Spring, despite it being a sacred place to them." *Id.* at ¶ 52.

- Defendants Crawford, Boudreau, Dolan, Adelson, Cademartori, Martindale Breen used the Lynnfield Conservation Commission and Lynnfield Police Department's "enforcement authority to intimidate and threaten Gattineri and his Native American guests on the Property, by interrupting prayer services, challenging the heritage of the Native Americans, and questioning the sincerity of Gattineri's religious beliefs." *Id.* at ¶ 117.

- Defendant Breen instructed his subordinates not to assist Plaintiffs and "threaten[ed] their positions in the police department if they did so." *Id.* at ¶ 96.

- "[T]he power of the LPD has been deployed to intimidate and harass Plaintiffs and deter BCW's customers . . . ."  For example, the LPD has questioned Gattineri for "giving away water to people walking in a multiple sclerosis fundraiser," "burning incense and praying for his father who had passed away just three days earlier, and "moving a lawnmower."  *Id.* at ¶¶ 97, 100.

- "On July 12, 2019, Welter arrived early in the morning, took pictures, and then ran away when Gattineri inquired about what she was doing; Gattineri reported the trespass, showed the LPD photos of Welter's car, which grazed him as she sped away, and asked the LPD to investigate, but, again, the LPD chose not to investigate."  *Id.* at ¶ 105.

As the foregoing demonstrates, the Plaintiffs have sufficiently alleged threatening, intimidating and coercive behavior on each individual Defendant's part and, further, that the Defendants took these actions to make Plaintiffs fearful or apprehensive of injury or harm (*e.g.*, Welter hitting Gattineri with her car after trespassing on the Property), and/or to compel or deter conduct that Plaintiffs have a legal right to do (*e.g.*, interrupting and photographing Plaintiffs' Native American guests during spiritual ceremonies on the Property and questioning the sincerity of Gattineri's religious beliefs).  While Defendants attempt to justify their actions by claiming that, from the Town's perspective, Gattineri has "engaged in several wetlands and zoning/building code violations," MOL at 27,[11] the Town's perspective is entirely irrelevant to the issue before the Court.[12]  The question of whether the alleged actions constitute threats, intimidation or coercion for purposes of the MCRA must be evaluated by determining whether a reasonable person in Plaintiffs' situation would have felt threatened, intimidated

---

[11] Defendants also state, "Plaintiff concedes that he was required to do an extensive amount of work to bring the Property into compliance with State and local wetlands laws and local zoning . . . ." MOL at 26-27 (citing Am. Compl., ¶ 177).  Plaintiffs make no concession in Paragraph 177, or otherwise, that any amounts spent on the Property somehow legitimizes the adverse actions taken by Defendants.

[12] To the extent Defendants contest these allegations, such arguments cannot be resolved at the motion to dismiss stage.  *See McGinn v. Exec. Office of Energy & Envtl. Affairs*, No. 19-CV-11551-IT, 2020 WL 6263648, at *9 (D. Mass. Oct. 23, 2020) (denying defendant's motion to dismiss the MCRA claim and noting that "[w]hether any of these accusations ultimately turn out to be true is a question for another day"); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 651 (D. Mass. 2015) (recognizing that further development of record is appropriate where it was unclear if alleged conduct would rise to level of threats, intimidation or coercion).

or coerced.  *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 520 (1st Cir. 2009) (emphasis added).

Plaintiffs submit that any reasonable person in Plaintiffs' position would have felt threatened, intimidated or coerced to forego their rights to benefit from their property, exercise their religious practices and associate with others in connection with the same, based on the individual Defendants' actions, as set forth in the Amended Complaint.  Accordingly, Plaintiffs have satisfied their pleading requirements for the MCRA claim.  *See Rinsky v. Trustees of Bos. Univ.*, No. 10-CV-10779-NG, 2010 WL 5437289, at *8 (D. Mass. Dec. 27, 2010) (finding plaintiff's allegation that defendant threatened, intimidated and coerced her to continue working one-on-one with a client after client displayed inappropriate conduct sufficient to constitute economic coercion under the MCRA); *McGinn v. Exec. Office of Energy & Envt'l. Affairs*, No. 19-CV-11551-IT, 2020 WL 6263648, at *9 (D. Mass. Oct. 23, 2020) (denying defendant's motion to dismiss MCRA claim where complaint alleged defendant had threatened to leak allegations to the press in an effort to coerce plaintiff to resign, among other things).

Finally, with respect to Defendants' contention that they are entitled to qualified immunity on the MCRA claim, "the Supreme Judicial Court of Massachusetts has held that MCRA claims are subject to the same standard of immunity . . . that is used for claims asserted under § 1983." *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010).  The qualified immunity argument set forth, *supra*, pages 20 to 22, therefore, applies with equal force to Plaintiffs' MCRA claim and precludes dismissal of Count VII at this stage in the proceedings.

### 2. Plaintiffs State a Claim for Violation of the Massachusetts Public Records Law.

Defendants next assert that Plaintiffs' only recourse for their Public Records Requests is with the Massachusetts Secretary of State's Office and in Superior Court under M.G.L. ch. 66, §§ 10-10A.  MOL at 27-28.  Defendants' brief is bereft of a single case citation on this point, perhaps because it is well settled that "[i]n a civil action where a district court has original jurisdiction, the court has supplemental

jurisdiction over all related claims that form part of the 'same case or controversy.'" *Rahul Chaturvedi,*

*v. Rahul Siddharth et al*, No. CV 20-11880-FDS, 2021 WL 664129, at *3 (D. Mass. Feb. 19, 2021)

(citing 28 U.S.C. § 1367(a)).  Supplemental jurisdiction under 28 U.S.C. § 1367 provides a basis to

exercise jurisdiction where, as here, the state law claims are "so related to" the federal claims "that they

form part of the same case or controversy under Article III of the United States Constitution." *Belezos v.*

*Bd. of Selectmen of Hingham*, No. CV 17-12570-MBB, 2019 WL 6340990, at *10 (D. Mass. Nov. 27,

2019); *Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC*, 730 F.3d 67, 72 (1st Cir. 2013).

To the extent Defendants are claiming that this Court lacks subject matter jurisdiction to hear this

claim because the Public Records Law provides that "the superior court shall have jurisdiction to enjoin

agency or municipal action," this argument equally fails.  "[A] grant of exclusive jurisdiction by a state

legislature cannot divest [a federal] court of subject matter jurisdiction." *Doe v. Fournier*, 851 F. Supp.

2d 207, 219 (D. Mass. 2012) (quoting *Landworks Creations, LLC v. U.S. Fidelity & Guar. Co.*, No.

CIV. 05–40072–FDS, 2005 WL 3728719, at *3 (D. Mass. Nov. 15, 2006)).[13]  In other words, even if the

Public Records Law limited jurisdiction to the superior court, which it does not, this Court would still

have jurisdiction to hear Plaintiffs' Public Records Law claim where the requirements for supplemental

jurisdiction have been met.  *See Thomas v. Salem State Univ.*, No. CIV.A. 11-10748-DJC, 2013 WL

3404331, at *7, fn. 3 (D. Mass. July 2, 2013).

Count VIII of the Amended Complaint asserts a claim against certain individual Defendants for

violating the Massachusetts Public Records Request, M.G.L. c. 66, § 10 (the "Public Records Law").  In

making this claim, Plaintiffs allege that the individual Defendants' refusal to comply with the Public

---

[13] Indeed, this Court has heard and decided matters relating to the Public Records Law.  *See Regis v.*
*City of Bos.*, No. 19-CV-10527-IT, 2020 WL 2838862, at *4 (D. Mass. June 1, 2020) (holding that
Plaintiffs' claim that the city failed to comply with the Massachusetts Public Records Law had not been
mooted by the city's subsequent production).

Records Law is part and parcel of their ongoing and concerted efforts to prevent Plaintiffs from

uncovering their conspiracy to deprive Plaintiffs of their civil rights.  *See* Am. Compl., ¶ 111.  The

Court, therefore, has jurisdiction over Plaintiffs' Public Records Law claim pursuant to 28 U.S.C. §

1367, as it "forms part of the same case or controversy" as Plaintiffs' claims under 42 U.S.C. §§ 1983,

1983(3) and 1986.  *Id.* at ¶ 4.

### 3.  The Amended Complaint States a Claim for Tortious Interference with Advantageous Relations

Defendants seek dismissal of Count IX on a number of grounds, including that Gattineri "has

failed to identify a single third party whom Defendants 'induced' to break a <u>contractual</u> relationship with

BCW.  MOL at 28-29 (emphasis added).  Defendants appear to have misconstrued Count IX, as it

asserts a claim for tortious interference with <u>advantageous</u> relations, not contractual relations, rendering

Defendants' contract argument inapposite.  *See* Am. Compl., ¶¶ 174-183.  In any event, Plaintiffs have

sufficiently alleged that each of the individual Defendants intentionally and improperly interfered with

Plaintiffs' business operations on the Property at virtually every opportunity they could.

The tort of intentional interference with advantageous relations protects a plaintiff's present and

future economic interests from wrongful interference.  *Blackstone v. Cashman*, 448 Mass. 255, 259

(2007).  To prevail on such a claim, a plaintiff must prove: (1) he had an advantageous relationship with

a third party; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's

interference with the relationship, in addition to being intentional, was improper in motive or means; and

(4) the plaintiff was harmed by the defendant's actions.  *Id.* (citing *Weber v. Community Teamwork, Inc.*,

434 Mass. 761, 781 (2001)).  Such improper conduct may exist if a party "used threats, misrepresented

any facts [or] defamed anyone" in the course of the interference.  *Cummings v. City of Newton*, 298 F.

Supp. 3d 279, 290 (D. Mass. 2018) (quoting *Geltman*, 406 Mass. at 817).  Where, as here, a plaintiff

sues a municipal official, a plaintiff must show that "actual malice, that is, a spiteful, malignant purpose,

unrelated to the legitimate municipal interest" was the controlling factor in the interference. *Id.* (quoting *Cachopa v. Town of Stoughton*, 72 Mass. App. Ct. 657, 661-62 (2008)).

The Amended Complaint outlines, in detail, the manner in which the individual Defendants' intentional, improper and malicious conduct has interfered with Plaintiffs' relationships with their customers, contractors, and other workers.  *See, e.g.*, Am. Compl., ¶ 29 (describing contractors and suppliers engaged to continue business operations); ¶ 97 ("As part of Defendants' conspiracy, the power of the LPD has been deployed to intimidate and harass Plaintiffs and deter BCW's customers, in order to deprive Plaintiffs of their right to operate a commercial spring water business."); ¶ 100 (LPD's presence on the Property scared away both BCW's customers and a worker, who refused to work for BCW again"); ¶ 102 ("Customers have expressed concern and fear about why the police have been there. Contractors have refused to continue working for Plaintiffs to avoid interference from the police."); ¶ 153 ("Defendants, with the help of their co-conspirators, have taken enforcement action against Plaintiffs based upon inaccurate or incomplete reports, have frightened Defendants' customers away, have interrupted private spiritual and religious services, and have prevented necessary repair and maintenance work from being done at the Property.").

Despite these well-pleaded allegations, Defendants claim that Plaintiffs' tortious interference claim against Defendants Crawford, Dolan, Boudreau, Curtin, Breen, McRae, Barrasso, MacDonald, and Welter should be dismissed because they were not part of BCW's permitting process.  MOL at 28. Once again, Defendants' argument misses the mark.[14]  Plaintiffs' allegations against these Defendants do not rest on their involvement with the permitting process but, rather, on the specific roles they played in the Defendants' conspiracy to interfere with Plaintiffs' civil rights and existing and prospective

---

[14] The Court in *Bliss v. Sanguinet*, rejected this very argument, noting that official authority to appoint or discipline plaintiff was "[ir]relevant to the Board defendants' liability for tortious interference" No. CIV.A. 12-10123-RWZ, 2013 WL 3334728, at *7 (D. Mass. June 24, 2013).

business relations in furtherance of their ultimate goal to drive Gattineri out of Town and BCW out of

business.  *See* Am. Compl., ¶¶ 32, 174, 177-183.  Such improper and spiteful conduct is sufficient to

establish liability for tortious interference with advantageous relations.[15]  *See, e.g.*, *Brockton Power LLC*

*v. City of Brockton*, 948 F. Supp. 2d 48, 75 (D. Mass. 2013) (finding malignant purpose based on

allegations that defendants "improperly interfered through their concerted efforts to destroy [plaintiffs']

project out of malice directed at the plaintiffs and their project"); *Bliss v. Sanguinet*, No. CIV.A. 12-

10123-RWZ, 2013 WL 3334728, at *7 (D. Mass. June 24, 2013) (alleging defendant "abdicat[ed] his

duties as appointing authority in favor of acceding to the improper personal and political interests of the

Board" sufficient to establish "a spiteful, malignant, purpose"); *Thomas v. Town of Salisbury*, 134 F.

Supp. 3d 633, 653 (D. Mass. 2015) (denying Town Manager's motion to dismiss where plaintiff alleged

defendant retaliated against plaintiff and held a sham hearing).

Defendants argue that Plaintiffs' tortious interference claim fails for the additional reason that

Plaintiffs have not "identified a single existing or potential customer or vendor who stopped or refused

to do business with BCW as a result of the defendants' alleged 'improper'" conduct."  MOL at 29.  The

law, however, does not require Plaintiffs to identify particular customers and vendors that stopped doing

business with Plaintiffs to assert a tortious interference claim.  In rejecting this very argument, the court

in *Gillette Company v. Provost*, explained:

> Gillette's insistence that ShaveLogic must present direct evidence that Gillette knew that
> particular   manufacturers   or   distributors   were   exploring   business   relationships   with

---

[15] Defendants claim that the allegations against McRae cannot sustain a tortious interference claim
because she was simply "[doing] her job" when she relayed "false rumors" about Gattineri's Italian
heritage and purported connections crime.  MOL at n.36.  Contrary to Defendants' unsupported
assertion, spreading false rumors can establish liability for tortious interference under Massachusetts
law.  *See, e.g.*, *Bliss v. Sanguinet*, No. CIV.A. 12-10123-RWZ, 2013 WL 3334728, at *7 (D. Mass. June
24, 2013) (finding the complaint adequately alleged that the Board defendants unfairly targeted plaintiff
and took various actions, both individually and collectively, to interfere with his employment with the
Town, including <u>conspiring with others to bring false allegations against plaintiff</u>) (emphasis added).

ShaveLogic is without merit. A party claiming tortious interference with prospective (rather than existing) business relationships is not required to prove that the defendant was aware of a potential relationship with a specific third party. **It is enough that the defendant knowingly interfered with a prospective relationship between the plaintiff and an identifiable class or category of third persons.**

*Gillette*, No. 1584CV00149BLS2, 2017 WL 2292748, at *8 (Mass. Super. Apr. 19, 2017) (string citation omitted) (emphasis added); *see also Alnylam Pharm., Inc. v. Dicerna Pharm.*, Inc., No. MICV20154126, 2017 WL 6395719, at *4 (Mass. Super. Oct. 23, 2017). As stated, *supra*, Plaintiffs have identified multiple classes and categories of third persons in the Amended Complaint with whom Plaintiffs' business relations have been affected because of the individual Defendants malicious and illegitimate conduct, including, but not limited to, BCW's existing and prospective customers, contractors, civil engineers, and landscapers. *See* Am. Compl., ¶¶ 58, 64, 69, 70-72, 76, 97, 100, 102, 116, 124, 134, 136, 144, 174-183.

### 4. The Amended Complaint States a Claim for Civil Conspiracy

Defendants seek to dismiss Plaintiffs' civil conspiracy claim in Count X on three grounds.

First, Defendants claim that the Amended Complaint does not sufficiently allege conduct to support a civil conspiracy claim with respect to Defendants Welter, Barrasso, McRae and Boudreau. True to form, Defendants' argument rests not upon the totality of the allegations against the Defendants, but, rather, upon Defendants' highly selective reading of the Amended Complaint. For example, Defendants claim that the Amended Complaint alleges that Defendant McRae "did nothing more than forward a number of complaints that she received." MOL at 30. Even a cursory reading of the Amended Complaint belies Defendants' position. *See, e.g.*, Am. Compl., ¶ 31 ("McRae relayed these false reports [about Gattineri] to the LBOH, to Adelson at the LCC, and to the MassDEP"); ¶ 50 ("McRae [and others] encouraged and facilitated the Neighbors' solicitation of Lynnfield residents to voice opposition to the proposed work at the LCC hearings throughout the summer and fall of 2017,

when BCW's NOI was reviewed."); ¶ 55 ("McRae and Martindale used the LCWD to engage CDM Smith for the purpose of promoting their agenda of obstructing Plaintiffs' commercial spring mineral water business on the Property, in violation of Plaintiffs' fundamental right to earn a living."); ¶ 90 ("McRae has consistently refused to provide Gattineri with the requested records, claiming that no such records exit . . . . McRae misinformed Gattineri as part of her agreement with the other Defendants to prevent Plaintiffs from successfully operating a commercial spring water business from the Property in furtherance of Defendants' discriminatory scheme to deny Plaintiffs' their fundamental rights."). Defendant's position with respect to Defendants Welter, Barrasso and Boudreau is equally unavailing, as the Amended Complaint sufficiently alleges their roles in the conspiracy to deprive Plaintiffs of their civil rights and the specific actions these Defendants took in furtherance of the same. *See, e.g.*, Am. Compl., ¶¶ 63, 64, 69, 70, 73 (Welter);[16] *id.* at ¶¶ 39, 51, 74, 75, 78, 79, 82, 84, 95 (Barrasso); *id.* at ¶¶ 33, 39, 40, 43, 46, 50, 53-57, 59, 70, 74, 75, 77-79, 95, 96, 112, 117, 126 (Boudreau).[17]

Second, Defendants claim that Plaintiffs' federal and civil conspiracy claims fail because "the Town cannot conspire with itself." MOL at 30. Here too, Defendants have misinterpreted Plaintiffs' conspiracy claims, as Plaintiffs have alleged that Defendants conspired with each other and several non-defendants, including, but not limited to, the Neighbors, Farrell, Sorli, the LHC, and the LCWD.[18] *See id.* at ¶¶ 65, 74, 76, 78, 82-84, 95, 150, 151, 158, 184-191. As Plaintiffs have alleged a conspiracy that

---

[16] With respect to the allegations against Welter, Defendants claim that the Amended Complaint does not state that she was trespassing. MOL at 29. That is, however, precisely what Plaintiffs allege. *See* Am. Compl., ¶ 105 ("Gattineri reported [Ms. Welter's] trespass, showed the LPD photos of Welter's car, which grazed him as she sped away . . . .").

[17] Defendants' reliance on Boudreau's resignation from his position as Town Administrator three years ago is curious, as they offer no authority to support the suggestion that his resignation somehow wiped the slate clean with respect to his role in the Defendants' conspiracy to violate Plaintiffs' civil rights. MOL at 30. Furthermore, as stated *supra* at 5-7, the allegations against Boudreau are not time barred.

[18] The Defendants acknowledge in their brief that the LCWD is an "autonomous municipal entity." MOL at n.28.

extends beyond the Town, Defendants' reliance on the intracorporate conspiracy doctrine is entirely misplaced. *United States v. Aegerion Pharm., Inc.*, No. 13-CV-11785-IT, 2019 WL 1437914, at *9 (D. Mass. Mar. 31, 2019) (finding Relators had sufficiently alleged a conspiracy of two or more persons by alleging that a non-Aegerion employee was part of the conspiracy); *see also United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 201 (D.D.C. 2011) ("[A]ll co-conspirators need not be joined to permit any one or more to be held liable for an unlawful conspiracy.").

Finally, Defendants allege that Plaintiffs' civil conspiracy claim fails because the alleged misconduct does not satisfy either type of conspiracy recognized under Massachusetts law, namely "true conspiracy" and "joint theory" conspiracy. MOL at 30. A "true conspiracy," requires a plaintiff to prove that defendants, by "mere force of numbers acting in unison," exercised "some peculiar power of coercion of the plaintiff which an individual standing in a like relation to the plaintiff would not have had." *Bliss v. Sanguinet*, No. CIV.A. 12-10123-RWZ, 2013 WL 3334728, at *8 (D. Mass. June 24, 2013) (quoting *Mass. Labourers' Health & Welfare Fund v. Philip Morris*, 62 F. Supp. 2d 236, 244 (D. Mass. 1999)). The "joint theory" conspiracy involves concerted actions of defendants where there is a "common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Bros. v. Town of Millbury*, No. CIV.A. 14-10122-TSH, 2014 WL 4102436, at *7 (D. Mass. Aug. 14, 2014) (quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994). A conspiratorial agreement may be "inferred from words, actions, and the interdependence of activities and persons involved." *Id.; see also Kyte v. Philip Morris Inc.*, 408 Mass. 162, 556 N.E.2d 1025, 1035 (1990) (explaining agreement may be "implied" or "inferred due to the concerted action of the parties"). Under the "joint theory" conspiracy, "[a] person may be liable if he 'knows that the conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other.'" *Id.*

(quoting *Kurker v. Hill*, 44 Mass.App.Ct. 184, 189 (1998)); *see also Nelson v. Nason*, 343 Mass. 220, 222 (1961) (recovery allowed under concerted action theory of § 876(b) where defendant's conduct caused another to engage in tortious activity).

Plaintiffs' allegations satisfy the pleading requirements for both types of civil conspiracy. In terms of the "true conspiracy" theory, Plaintiffs have alleged that the Defendants and their co-conspirators, acting in unison, were able to exercise a "peculiar power of coercion" in their effort to deprive Plaintiffs of their civil rights, which they would not have been able to apply acting individually. *See* Am. Comp., ¶ 187. More specifically, the Amended Complaint alleges that Plaintiffs faced disparate, harassing and coercive treatment at virtually every level with the Town (i.e., the LCC, the LPD, the Town Administrator, Building Inspector, Board of Selectmen, LBOH, among others) in furtherance of the Defendants and their co-conspirators' desire to literally and figuratively drive Plaintiffs out of town. *See, e.g., id.* at ¶¶ 2, 33-36, 44. In combining their efforts, Defendants and their co-conspirators were able to send Plaintiffs a stronger and more coercive message – one that would not have been possible had they been acting independently – namely that Plaintiffs were not welcome in Lynnfield and, further, that they would continue to face discrimination if they refused to leave. While Defendants note that this cause of action is "very limited," Defendants' and their co-conspirators' egregious and pervasive conduct, as set forth in the Amended Complaint, meets the standard for such an action.[19] *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, No. CIVA 07-12018-DPW, 2008 WL 4595369, at *23 (D. Mass. Sept. 30, 2008) (A common example of this type of conspiracy is

---

[19] Rather than address Defendants' collective actions, Defendants suggest, without citing any legal authority, that Defendants could not have conspired with one another because they operated under "separate bodies with entirely separate jurisdictions and enforcement authority." MOL at 31. Plaintiffs agree that the Defendants *should* have operated independently without any improper animus or ill will against Plaintiffs, yet they abdicated their responsibilities in furtherance of a concerted effort to deprive Plaintiffs of their civil rights and to drive them out of Town.

"the combined action of groups of employers or employees, where through the power of combination, pressure is created and results brought about different in kind from anything that could have been accomplished by separate individuals.") (quoting *Fleming v. Dane*, 304 Mass. 46, 50 (1939)).

Turning to the "joint theory" conspiracy, Defendants double-down on their contention that Plaintiffs cannot maintain such an action because the individual Defendants have not committed any tortious acts against Plaintiffs.  MOL at 31.  However, as the numerous allegations cited throughout this Opposition demonstrate, Plaintiffs have sufficiently alleged tortious conduct on behalf of each of the individual Defendants notwithstanding Defendants' arguments to the contrary.  In short, the Amended Complaint sets forth the myriad of ways in which the Defendants knowingly supported, encouraged and provided substantial assistance to each other and their co-conspirators in furtherance of their goal to drive Plaintiffs out of business and out of Lynnfield, thereby stating a "joint theory" conspiracy against the Defendants and their co-conspirators.  *See Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 76 (D. Mass. 2013) (allegations of substantial concerted action undertaken by various combinations of defendants over extended period of time, including discrete acts in furtherance of the conspiracy committed by each individual defendant, sufficient to state a civil conspiracy claim); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 650 (D. Mass. 2015); *Bros. v. Town of Millbury*, No. CIV.A. 14-10122-TSH, 2014 WL 4102436, at *8 (D. Mass. Aug. 14, 2014).

## IV.    CONCLUSION

For all the reasons set forth above, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion to Dismiss in its entirety and allow this action to proceed.

Respectfully submitted,

BOSTON CLEAR WATER COMPANY, LLC
and ANTHONY GATTINERI,

By and through their attorneys,

/s/ *Kelley A. Jordan-Price*
Kelley A. Jordan-Price, BBO #565964
kprice@hinckleyallen.com
Tara A. Singh, BBO # 697128
tsingh@hinckleyallen.com
HINCKLEY ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
(617) 345-9000


/s/ *Julie K. Connolly*
Julie K. Connolly, NH Bar No. 10984
*Pro Hac Vice*
Julie Connolly Law PLLC
8 Ridge Road
P.O. Box 665
Concord, NH 03302-0665
(603) 496-5927
julie@jkc-law.com


Dated:  February 26, 2021

## **CERTIFICATE OF SERVICE**

     I hereby certify that on 26th day of February, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.


                             /s/ *Julie K. Connolly*
                             Julie K. Connolly